## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Lucinda Beadle, Personal Representative of the Estate of Daniel A. Elrod, Deceased,<br><br>**Plaintiff,**<br>v.<br><br>Former Officer Alvin Lugod, individually and in his official position as an Omaha Police Officer and Agent of the City of Omaha; Does #1-25, inclusive, in their official capacities; Todd Schmaderer only in his official capacity as City of Omaha Chief of Police;<br>And<br>The City of Omaha,<br><br>**Defendants.** | Case No. 8:18-cv-82<br><br><br><br>1st Amended Complaint for Damages for Violations of Civil Rights & Jury Demand |

Plaintiff alleges:

### Case Overview

1.      Daniel "Danny" A. Elrod ("Mr. Elrod" and "Decedent") died on February 23, 2015 ("the incident").

2.      At the time of the incident, Mr. Elrod had clearly established constitutional and civil rights.

3.      At the time of the incident and while Lugod was acting within the scope and course of his employment as a police officer for the Omaha Police Department ("OPD"), three bullets discharged from Defendant Alvin Lugod's ("Lugod") service revolver after Lugod intentionally aimed at the back of Mr. Elrod and intentionally pulled the trigger of his service weapon.

4.       All three bullets stuck Mr. Elrod in his back while Mr. Elrod was located on the Sports Car Garage premises.

5.      One or more of the bullets killed Mr. Elrod.

6.     At no time, from the moment Lugod encountered Mr. Elrod to the moment Lugod fired his service weapon at Mr. Elrod, did Mr. Elrod have a weapon nor did he use force of any kind.

7.     At no time, from the moment Lugod encountered Mr. Elrod to the moment Lugod fired his service weapon at Mr. Elrod, did Mr. Elrod have a weapon or use deadly force of any kind.

8.     Mr. Elrod did not pose an imminent threat of death or serious bodily injury to any person at any relevant time during the incident or his interaction with Omaha Police Officers, including Lugod, and up and until he was shot and killed by Lugod.

9.     At all times prior to and at the moment he was shot dead, Mr. Elrod was visibly intoxicated such that an objective and reasonable police officer would have appreciated such condition and acted appropriately.

10.    Mr. Elrod's death and constitutional and statutory loss is the proximate result of the intentional acts or intentional failures to act of Mr. Lugod and others.

11.    No reasonable police officer would have reasonably believed that his or her actions of shooting the first bullet into Mr. Elrod's back were lawful in light of clearly established law and based upon all information available to him or her at the time of the shooting.

12.    No reasonable police officer would have reasonably believed that his or her actions of shooting the second bullet into Mr. Elrod's back were lawful in light of clearly established law and based upon all information available to him or her at the time of the shooting.

13.    No reasonable police officer would have reasonably believed that his or her actions of shooting the third bullet into Mr. Elrod's back were lawful in light of clearly established law and based upon all information available to him or her at the time of the shooting.

14.    Multiple other Omaha Police Officers were on scene prior to and at the moment of Lugod's decision to fire bullets from his service weapon at Mr. Elrod and none of the other Omaha Police Officers discharged their service weapon or firearm of any kind at any time.

2

### Jurisdiction, Venue, Parties

15.     This is an action for depravation and violation of civil rights guaranteed by the United States Constitution, Federal law and State law and for wrongful death. This action arises under Title 42 of the United States Code, Section 1983. Jurisdiction and venue is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1343, and 1391(b) because all of the unlawful acts and practices alleged herein occurred in the District of Nebraska.

16.     The Plaintiff is Lucinda Beadle, the Personal Representative ("PR") of the estate of the Decedent.  She is the mother-in-law of decedent and grandmother of Jacob D, decedent's son. The appointment of Ms. Beadle as PR was accomplished in County Court, Douglas County, Nebraska on February 29, 2016 in case No. PR 16-305.   The names and birth years of Decedent's next of kin are:

| | | |
|---|---|---|
| Amanda Elrod | age over 30 years | Spouse |
| Jacob D | minor | Son |
| Christopher D | minor | Son |
| Daniel McFerrin | age over 21 years | Son |
| Chandler Riley | age over 21 years | Daughter |
| Taylor Myers | age over 21 years | Daughter |
| David Dewitt | age over 21 years | Son |

17.     The City of Omaha ("City") is a Nebraska political subdivision and was at all times material hereto responsible for and directly liable for the conduct of the employees, agents and appointees of the City of Omaha Police Department; for the operation of the City of Omaha Police Department; for establishing ordinances, customs, policies and procedures to regulate the conduct, hiring, training, supervision and discipline of employees, agents, appointees and servants of the City of Omaha Police Department; and for ensuring that the employees, agents and appointees of the City of Omaha Police Department, obey the laws of the State of Nebraska and the United States.  At the time of this filing, Omaha's Mayor is Jean Stothert and its City Clerk is Buster Brown.  They may be served with process at 1819 Farnam Street, Suite LC1, Omaha, NE 68183.

DB1308.02

18.     The OPD is an agency of the City operated by the City.  Its Police Officers Officer Doe #1, Officer Doe #2, Officer Doe #3 and Lugod, were at all relevant times employees and agents of the City while acting within the scope of their employment.  Mr. Elrod was shot by Lugod three times while the involved members of the OPD were acting within the scope of their employment with the City.

19.     Defendant Todd Schmaderer ("Schmaderer") was at all times mentioned herein the police chief of the City of Omaha. He is being sued in his official capacity as Chief of Police.

20.     Defendant Alvin Lugod ("Lugod") is a resident of Sarpy County, Nebraska, and at all material times hereto was a police officer for the City of Omaha Police Department acting in such capacity as the employee, agent, appointee and/or servant of the City of Omaha. He is being sued individually and in his official capacity of a police officer who acted under the color of law at all relevant times.

21.     Plaintiff is unaware of the true names and capacities of Defendant Does #1-25 inclusive, and therefore sues these defendants by such fictitious names. Plaintiff believes Does #1-25, inclusive, so named is responsible in some manner for the injuries and damages sustained by Decedent and his Estate and his next-of-kin as set forth herein. Plaintiff shall state the names and capacities of Does #1-25, inclusive, when they have been ascertained.

22.     In engaging in the conduct described herein, Defendant Lugod and Defendant Does #1-25, acted under the color of law and in the course and scope of his or their employment with the City of Omaha. In engaging in the conduct described herein, Defendant Lugod exceeded the authority vested in him as a police officer under the United States and Nebraska Constitutions and as a police officer employed by the City of Omaha. Defendant City and its employee Schmaderer also acted under the color of law. Defendant Does #1-25 also engaging in the conduct exceeding the authority vested in them under the United States and Nebraska Constitutions

### The Facts, the Shooting and Mr. Elrod's Suffering and Death

23.     All allegations above are incorporated here.

24.     Decedent was killed by former Omaha Police Officer Alvin Lugod, on the premises of the Sports Car Garage at 1461 South 13th Street Omaha, Douglas County Nebraska, while Lugod was acting in the performance of his professional duties.

25.     At least Four Omaha police officers were dispatched or responded to an area near the location where Decedent was killed, including Officer Doe #1, Officer Doe #2, Officer Doe #3 and Lugod.

26.     Upon each officer encountering Mr. Elrod, he was unarmed and walking calmly and slowly not engaged in any aggressive or violent or dangerous acts of any kind.

27.     Mr. Elrod was visibly intoxicated and otherwise mentally impaired.

28.     Mr. Elrod's intoxication was presumed or obvious or should have been reasonably presumed or obvious by Defendant Lugod.

29.     Mr. Elrod did not possess any weapon or dangerous instrumentality of any kind.

30.     At no time did Mr. Elrod make any threat with a weapon to any Officer, including Lugod.

31.     There was no rationale or good faith based reason or probably cause for Defendant Lugod to believe Mr. Elrod was actually armed with a gun.

32.     There was no rationale or good faith based reason or probable cause for a reasonably trained Omaha Police officer to believe Mr. Elrod was actually armed with a gun.

33.     There was no rationale or good faith based reason or probably cause for Defendant Lugod to believe Mr. Elrod was actually armed with any dangerous instrumentality.

34.     There was no rationale or good faith based reason or probable cause for a reasonably trained Omaha Police officer to believe Mr. Elrod was actually armed with any dangerous instrumentality.

35.     Even if, Mr. Elrod stated he had a gun, there was no rationale or good faith based reason for Defendant Lugod to believe Mr. Elrod was actually armed with a gun.

36.     Even if, Mr. Elrod stated he had a weapon, there was no rationale or good faith based reason for Defendant Lugod to believe Mr. Elrod was actually armed with any dangerous instrumentality.

5

37.    Even if, Mr. Elrod stated he had a gun, at no time did Mr. Elrod ever display a firearm of any kind.

38.    There was no objective evidence equating to probable cause which would have allowed a reasonable presumption by a trained Omaha Police officer that Mr. Elrod was armed.

39.    No report was made to the OPD or its 911 or dispatch that Mr. Elrod had a gun or dangerous instrumentality.

40.    No police dispatch regarding Mr. Elrod ever stated that Mr. Elrod had a gun or dangerous instrumentality.

41.    Mr. Elrod never threatened the use of deadly force at any time while at the Family Dollar store.

42.    Mr. Elrod never threatened the use of deadly force at any time while leaving the Family Dollar store.

43.    Mr. Elrod never threatened the use of deadly force at any time while walking towards the Sports Car Garage premises.

44.    Mr. Elrod never threatened the use of deadly force at any time while on the Sports Car Garage premises.

45.    Upon initially encountering Mr. Elrod, Defendant Lugod, rather than trying to calmly deal with the situation at hand, exited his police cruiser with his service weapon drawn and pointed at Mr. Elrod shouting to Mr. Elrod "your're gonna get shot!" This was unreasonable and needlessly escalated the situation and combined to create the environment leading to Mr. Elrod's death.

46.    Defendant Lugod seconds later and without justification first infers that he is going to shoot Mr. Elrod by stating "don't make me do this" and then again states "your're gonna get shot!" This was unreasonable and needlessly escalated the situation and combined to create the environment leading to Mr. Elrod's death.

47.    Defendant Lugod's words and actions towards Mr. Elrod are inconsistent with best-practices and the applicable standard of care governing police officers similarly situated as Defendant Lugod as it is an officers duty to de-escalate and not escalate the situation by their own conduct.

6

48.     Defendant Lugod provoked and caused the shooting of Mr. Elrod, not Mr. Elrod.

49.     Defendant Lugod's conduct exhibited fundamental unconstitutional training by Defendant City and Schmaderer in the use of deadly force in general and specifically in the use of deadly force upon an intoxicated and mentally impaired subject as Mr. Elrod.

50.     During the moments when Officer Lugod was threating to shoot Mr. Elrod, Mr. Elrod posed no risk of imminent harm.

51.     During the moments when Officer Lugod was threating to shoot Mr. Elrod, Mr. Elrod was not attempting to evade arrest.

52.     During the moments when Officer Lugod was threating to shoot Mr. Elrod, Mr. Elrod was not an imminent risk to the public at large.

53.     No reasonable Omaha Police officer would have believed Mr. Elrod was armed based on his actions and inactions.

54.     No reasonable Police officer would have believed Mr. Elrod was armed based on his actions and inactions.

55.     There was no objective evidence which would have allowed a reasonable presumption by Defendant Lugod that Mr. Elrod was armed at the time he was shot with the first bullet.

56.     There was no objective evidence which would have allowed a reasonable presumption by a reasonably trained Omaha Police officer to conclude that Mr. Elrod was armed at the time he was shot with the first bullet.

57.     There was no objective evidence which would have allowed a reasonable presumption by Defendant Lugod that Mr. Elrod was armed at the time he was shot with the second bullet.

58.     There was no objective evidence which would have allowed a reasonable presumption by a reasonably trained Omaha Police officer to conclude that Mr. Elrod was armed at the time he was shot with the second bullet.

59.     There was no objective evidence which would have allowed a reasonable presumption by Defendant Lugod that Mr. Elrod was armed at the time he was shot with the third bullet.

7

60.    There was no objective evidence which would have allowed a reasonable presumption by a reasonably trained Omaha Police officer to conclude that Mr. Elrod was armed at the time he was shot with the third bullet.

61.    Even after Mr. Elrod was hit with a Taser, he did not attempt to retaliate in any way at all.

62.    Even after Mr. Elrod was hit with a Taser, he did not retrieve any gun of his own.

63.    Even after Mr. Elrod was hit with a Taser, he did not retrieve any dangerous instrumentality of his own.

64.    After being hit with a Taser, Mr. Elrod turned his back to Defendant Lugod and attempted to climb into a barbed-wire fenced in area on the Sports Car Garage premises.

65.    Prior to discharging his service weapon into the back of Mr. Elrod, Defendant Lugod failed to appreciate the risks of firing his weapon and missing his intended target, Mr. Elrod, who was standing on the hood of a car.

66.    At all times after Defendant Lugod arrived on the Sports Car Garage premises, Mr. Elrod was visible to Lugod and was illuminated by the headlights of the OPD patrol cars and lights on the Sports Car Garage premises.

67.    At the moment, that Mr. Elrod's back was turned to Lugod, both of Elrod's hands were up in the air on the barbed-wire fence, and Mr. Elrod had lifted his right leg up the air and was engaged in his attempt to leap further away from the direction of all Officers over the fence and into the fenced in area, and at a time that Mr. Elrod clearly did not have any weapon of any kind in either hand or on his person, Defendant Lugod shot Mr. Elrod in the back three times.[1]

68.    This shooting, and each individual shot, was an unreasonable unjustifiable use of deadly force that constitutes excessive force for the actual situation and facts then existing and was a violation of Mr. Elrod's well-established constitutional and civil rights.

69.    At the time Defendant Lugod's weapon discharged, Lugod knew Mr. Elrod's hands were visible and in the air and without any weapon or dangerous instrumentality and that Mr. Elrod was turned away from Lugod with his back facing Defendant Lugod.

---

[1] See Police Dash Cam Video

70.     At each time Defendant Lugod's weapon discharged, Lugod knew or should have known and appreciated that Mr. Elrod's hands were visible and in the air and without any weapon or dangerous instrumentality.

71.     At each time Defendant Lugod's weapon discharged, Lugod knew or should have known and appreciated that Mr. Elrod's right leg was visible and in the air and that he was standing on the hood of a motor vehicle balancing only on his left leg.

72.      At each time Defendant Lugod's weapon discharged, Lugod knew or should have known and appreciated that Mr. Elrod was about twenty feet or so away from Defendant Lugod and each other officer.

73.     At each time Defendant Lugod's weapon discharged, Lugod knew or should have known and appreciated that Mr. Elrod was illuminated and in plain sight based upon the position of the headlights and other lighting from the police cruisers on scene, as well as lighting at the premises.

74.     At each time Defendant Lugod's weapon discharged, Lugod knew or should have known and appreciated that Mr. Elrod was without means of inflicting any imminent death or injury upon any person on scene.

75.     At each time Defendant Lugod's weapon discharged, a reasonable Officer in the same or similar situation as Lugod would have known and appreciated that Mr. Elrod's hands were visible and in the air and without any weapon or dangerous instrumentality.

76.     At each time Defendant Lugod's weapon discharged, a reasonable Officer in the same or similar situation as Lugod would have known and appreciated that Mr. Elrod's right leg was visible and in the air and that he was standing on the hood of a motor vehicle balancing only on his left leg.

77.      At each time Defendant Lugod's weapon discharged, a reasonable Officer in the same or similar situation as Lugod would have known and appreciated that Mr. Elrod was about 20 feet or so away from Defendant Lugod and each other officer.

78.     At each time Defendant Lugod's weapon discharged, a reasonable Officer in the same or similar situation as Lugod would have known and appreciated that Mr. Elrod was illuminated and in plain sight based upon the position of the headlights and other lighting from the police cruisers on scene, as well as lighting at the premises.

DB1308.02

79.    At each time Defendant Lugod's weapon discharged, a reasonable Officer in the same or similar situation as Lugod would have known and appreciated that Mr. Elrod was without means of inflicting any imminent death or injury upon any person on scene.

80.    Defendant Lugod's actions of shooting the first bullet were unreasonable and no probable cause existed to justify such actions.

81.    Defendant Lugod's actions of shooting the second bullet were unreasonable and no probable cause existed to justify such actions.

82.    Defendant Lugod's actions of shooting the third bullet were unreasonable and no probable cause existed to justify such actions.

83.    None of the other Officers on scene fired their service weapons or revolvers at or prior to or after the times Lugod's weapon discharged.

84.    None of the other Officers on scene fired their service revolvers at or prior to or after the time Lugod's weapon discharged because none of those Officers feared that their lives were in imminent danger.

85.    None of the other Officers fired their service revolvers at or prior to the time Lugod's weapon discharged because none of those Officers feared that the life of any other Officers on scene was in imminent danger.

86.    None of the other Officers fired their service revolvers at or prior to the time Lugod's weapon discharged because none of those Officers feared that the life of any member of the public was in imminent danger.

87.    At the moment Defendant Lugod fired his first, second, and third shots into Mr. Elrod's back, Officer Doe #1 did not believe Mr. Elrod was armed.

88.    At the moment Defendant Lugod fired his first, second, and third shots into Mr. Elrod's back, Officer Doe #2 did not believe Mr. Elrod was armed.

89.    At the moment Defendant Lugod fired his first, second, and third shots into Mr. Elrod's back, Officer Doe #3 did not believe Mr. Elrod was armed.

90.    Neither Officer Doe #1, #2, or #3 believed Mr. Elrod was armed.

91.    At the moment Defendant Lugod fired his first, second, and third shots into Mr. Elrod's back, Defendant Lugod did not believe Mr. Elrod was armed.

DB1308.02

92.     Even if any Officer later claims that at the time Lugod fired any and all of his three shots into Mr. Elrod's back, that they believed Mr. Elrod was in fact armed with a gun, any such belief was not reasonable given the totality of all circumstances existing prior to and at the time of the incident.

93.     Mr. Elrod was not an imminent threat of death to Alvin Lugod at any times during the incident.

94.     Mr. Elrod was not an imminent threat of death to any Officer on the scene at any times during the incident.

95.     Mr. Elrod was not an imminent threat of death to any member of the public at any times during the incident.

96.     Mr. Elrod was not an imminent threat of serious bodily injury to Alvin Lugod at any times during the incident.

97.     Mr. Elrod was not an imminent threat of serious bodily injury to any Officer on the scene at any times during the incident.

98.     Mr. Elrod was not an imminent threat of serious bodily injury to any member of the public at any times during the incident.

99.     There was no emergency at the time of the first bullet was fired from Lugod's service weapon.

100.    There was no emergency at the time of the second bullet was fired from Lugod's service weapon.

101.    There was no emergency at the time of the third bullet was fired from Lugod's service weapon.

102.    Mr. Elrod was not an imminent threat of death to anyone on scene at the moment of the first gun shot was fired by Defendant Lugod.

103.    Mr. Elrod was not an imminent threat of death to anyone on scene at the moment of the second gun shot was fired by Defendant Lugod.

104.    Mr. Elrod was not an imminent threat of death to anyone on scene at the moment of the third gun shot was fired by Defendant Lugod.

105.    Mr. Elrod was not an imminent threat of death at any time during the incident.

11

106.    Mr. Elrod was not an imminent threat of serious bodily injury to anyone at the moment of the first gun shot being fired by Defendant Lugod.

107.    Mr. Elrod was not an imminent threat of serious bodily injury to anyone at the moment of the second gun shot being fired by Defendant Lugod.

108.    Mr. Elrod was not an imminent threat of serious bodily injury to anyone at the moment of the third gun shoot being fired by Defendant Lugod.

109.    Mr. Elrod was not an imminent threat of serious bodily injury to anyone at any time during the incident.

110.    Mr. Elrod was not a significant threat of death to anyone at the moment of the first gun shot being fired by Defendant Lugod.

111.    Mr. Elrod was not a significant threat of death to anyone at the moment of the second gun shot being fired by Defendant Lugod.

112.    Mr. Elrod was not a significant threat of death to anyone at the moment of the third gun shoot being fired by Defendant Lugod.

113.    Mr. Elrod was not a significant threat of death at any time during the incident.

114.    Mr. Elrod was not a significant threat of death at any time during the incident.

115.    Mr. Elrod never used deadly force during the incident or at any time while at the Family Dollar store.

116.    There was no substantial risk that Mr. Elrod would have caused death or serious bodily harm to Defendant Lugod if Mr. Elrod's apprehension was delayed.

117.    There was no substantial risk that Mr. Elrod would have caused death or serious bodily harm to Officer Doe #1, #2, or #3 or any other Officer on scene, if any, if Mr. Elrod's apprehension was delayed.

118.    There was no substantial risk that Mr. Elrod would have caused death or serious bodily harm to any member of the public if his apprehension was delayed.

119.    At many times prior to Defendant Lugod shooting Mr. Elrod, Mr. Elrod made the same or similar motion or motions, as he did at the moment Lugod shot him, turning towards the other Officers opposite the location where Defendant Lugod and a female officer were located, and at no time during this similar behavior did any Officer fire their service weapon.

120.    Any defense that Defendant Lugod believed Mr. Elrod was an imminent threat of death or serious bodily harm to the male officer standing at a about a forty-five degree angle to where Lugod was located is unreasonable and unfounded based on the facts and the totality of the circumstances and how prior events actually occurred.[2]

121.    No members of the public were on scene during the incident in which Defendant Lugod shot and killed Mr. Elrod.

122.    None of the acts of the three bullets being discharged from Lugod's service revolver were justifiable.

123.    At the moment Defendant Lugod fired his first bullet into Mr. Elrod's back, Mr. Elrod was not with reasonable means to escape the Omaha Police Officers on scene.

124.    At the moment Defendant Lugod fired his second bullet into Mr. Elrod's back, Mr. Elrod was not with reasonable means to escape the Omaha Police Officers on scene.

125.    At the moment Defendant Lugod fired his third bullet into Mr. Elrod's back, Mr. Elrod was not with reasonable means to escape the Omaha Police Officers on scene.

126.    Defendant Lugod's acts of firing each of the three bullets did not stem from any attempt at self-defense.

127.    Defendant Lugod intended to cause a harmful or offensive contact to Mr. Elrod.

128.    Defendant Lugod intended to cause an imminent apprehension of a harmful or offensive contact to Mr. Elrod.

129.    From the moment Defendant Lugod initially confronted Mr. Elrod on or near the Sports Car Garage premises to the moment he first shot Mr. Elrod, Mr. Elrod committed no unlawful act.

130.    Defendant Lugod was attempting to detain and not arrest Mr. Elrod at all relevant times.

131.    At one or more times during the incident Defendant Lugod acted with deliberate indifference towards Mr. Elrod's constitutional and civil rights.

---

[2] See Police Dash Cam Video

132.    A reasonably well-trained police officer would have known that shooting an individual in the back under the circumstances of the incident described herein is unlawful conduct which violated the constitutional and civil rights of Mr. Elrod.

133.    Mr. Elrod died at the University of Nebraska Medical Center approximately three hours after Defendant Lugod shot him in the back.

134.    Mr. Elrod's death was the proximate cause of conduct by Defendant Lugod in violation of Mr. Elrod's constitutional rights.

135.    Defendant Lugod's conduct was outside the scope of his duties.

136.    Defendant Lugod's shooting of Mr. Elrod was malicious, wanton, and oppressive.

137.    Clearly established law provided notice to Defendant Lugod that his actions as discussed herein would violate the Fourth and Fourteenth Amendments.

138.    Given all the circumstances existing prior to the instant Defendant Lugod began firing his service weapon into Mr. Elrod's back, no reasonable officer would have assessed Mr. Elrod as such an imminent injury risk or flight risk as to justify shooting Mr. Elrod.

139.    Given all the circumstances, no reasonable Officer would have assessed Mr. Elrod as such an imminent injury risk or flight risk as to justify shooting Mr. Elrod.

140.    Governmental interests of protecting officers and the public from an imminent risk of death or serious physical injury were simply not implicated at the moment Defendant Lugod decided to shoot Mr. Elrod in the back.

141.    Officer Lugod was previously involved in a shooting while on duty with the OPD that caused the death of a resident of Omaha.

142.    OPD and Schmaderer were aware of the prior killing by Lugod of another member of the Omaha public, yet Defendant Lugod remained on the streets as an Omaha Police Officer.

143.    Other allegations of misconduct and of inappropriate use of force by Defendant Lugod were reported to the OPD and Schmaderer yet Defendant Lugod remained on the streets as an Omaha Police Officer.

DB1308.02

144.   It was foreseeable by OPD and Schmaderer that the risk of allowing Officer Lugod to be placed in a similar set of circumstances as his prior fatal shooting could lead to similar fatal results.

145.   It was foreseeable by OPD and Schmaderer that Officer Lugod would make unreasonable decisions and act unreasonably and with excessive force when given the opportunity to use his service revolver.

146.   OPD has in place and did teach to Defendant Lugod policies and procedures that are unconstitutional and/or misstate applicable law outlining situations where a Police Officer can use deadly force and/or failed to properly train Defendant Lugod in constitutional methods to employ prior to using deadly force.

147.   Given the totality of all information known by and available to the OPD and Schmaderer, decisions by OPD and Schmaderer to allow Lugod to remain in his position as police officer in the field and failing to appreciate he did not have the training and/or ability to fully appreciate when and how lethal force was to be used or was justifiable, and failing to appreciate Defendant Lugod's penchant for quickly resorting to force and deadly force when not justified or lawful, are all decisions reflecting a conscious disregard for a high risk that Lugod would use excessive force in violation of one's constitutional and civil protected federal rights and states rights.

148.   Mr. Elrod's death, Decedent's damages, and decedent's next-of-kin's damages were proximately caused by acts and failures to act as committed by Defendant Lugod and Schmaderer and the OPD.

149.   Following Defendant Lugod's killing of Mr. Elrod, the OPD was going to terminate Lugod's employment for his actions and breaches of OPD policy and procedure but Defendant Lugod instead resigned in a negotiated settlement with OPD.

150.   None of Mr. Elrod's actions constituted a superseding or intervening cause of his own death.

151.   Any and all reasonable persons and officials similarly situated as Defendant Lugod was at all relevant times would have known the conduct alleged herein as taken against Mr. Elrod was illegal.

152.    Any and all reasonably well trained police officers placed in a similar situation as described herein would have known shooting Mr. Elrod in the back at the time Defendant Lugod did so would violate Mr. Elrod's constitutional rights.

### Intentional Acts

153.    All allegations above are incorporated here.

154.    Defendant Lugod intentionally escalated the environment by threating to shoot Mr. Elrod almost immediately after encountering Mr. Elrod.

155.    Defendant Lugod intentionally placed Mr. Elrod in immediate fear of death and severe bodily harm.

156.    Defendant Lugod intentionally aimed his service revolver at Daniel Elrod's back.

157.    Defendant Lugod intentionally battered Mr. Elrod without just provocation or cause.

158.    Defendant Lugod intentionally fired bullets from his service revolver three times at Daniel Elrod's back.

159.    Defendant Lugod intentionally struck Daniel Elrod in the back with three bullets fired from Lugod's service revolver.

160.    Defendant Lugod intentionally killed Daniel Elrod.

161.    Defendant Lugod engaged in conduct that violated clearly established statutory or constitutional or civil rights of Mr. Elrod which a reasonable Officer would have appreciated and not similarly violated.

162.    Defendant Lugod knowingly violated the law when taken these actions described herein.

163.    Officers Doe #1, #2, and #3 knew and appreciated Mr. Elrod's well-established constitutional rights and refrained from violating them when each decided to not discharge their service weapons and not shoot Mr. Elrod at the moments Defendant Lugod did.

164.    Lugod's seizure of Mr. Elrod by shooting him, despite Mr. Elrod being unarmed and not posing imminent danger, was an unconstitutional act. All such acts by

Defendant Lugod constitute excessive force and excessive and unjustified use of deadly force.

165.    Defendant Lugod's act of shooting Mr. Elrod in the back three times, shocks the conscience and offends the community's sense of fair play and decency.

166.    Lugod's conduct was not only the cause in fact of Mr. Elrod's injuries, but also the proximate cause of Mr. Elrod's constitutional or statutory loss.

167.    It was reasonably foreseeable that Mr. Elrod would suffer an injury including death if Defendant Lugod were to shoot Mr. Elrod in the back.

168.    One or more of the foregoing acts or failures to act of Defendant Lugod and/or the OPD and/or Schmaderer, set forth in the paragraphs above and their subparts, constitute the proximate cause of Decedent's and Decedent's Estate's injuries and all damages arising from these injuries.

<u>**First Cause of Action:**</u>
**Constitutional and Civil Rights Violations - 42 U.S.C. § 1983**
(Against Defendant Lugod and Does #1-10)

169.    All allegations above are renewed here.

170.    Defendant Lugod and Does #1-10, inclusive, acts and omissions described above and incorporated here, were violations and depravations of rights guaranteed to Mr. Elrod by the First, Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, by federal statutes,  including but not limited to, the rights to be free from an unreasonable seizure of his person and the rights to be free from the use of excessive, unreasonable, and unjustified force and deadly force, and otherwise be able to enjoy the rights and privileges secured by the United States Constitution and by virtue of being an American and a citizen of Nebraska.

171.    Mr. Elrod had a right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendment of the United States Constitution.

172.    Mr. Elrod had a right to be free from cruel and unusual punishment and assault, as guaranteed by the Eighth Amendment of the United States Constitution.

DB1308.02

173.    Mr. Elrod had a right to his own pursuits of life, liberty, and to not be deprived due process or equal protection of the law, as guaranteed by the Fourteenth Amendment of the United States Constitution.

174.    The acts described above were taken while Defendant Lugod and Does #1-10 were acting under the color of state law in direct violation of Decedent's constitutional rights and privileges, and are therefore actionable under 42 U.S.C. § 1983.

175.    As a direct result of Defendants' actions, Decedent suffered a direct and immediate violation of his fundamental rights guaranteed by the United States Constitution and is therefore entitled to attorney fees, pursuant to 42 U.S.C. § 1988. Most notably, the right not to be killed by a police officer when you are not posing an imminent threat of danger to any person.

176.    Qualified Immunity does not apply because Defendant Lugod violated Mr. Elrod's constitutional rights that were clearly established at the moments Defendant Lugod fired three bullets at the back of Mr. Elrod.

177.    Decedent and Decedent's Estate have suffered damages as a direct and proximate result of Defendants' violations of Decedent's constitutional rights, including but not limited to, subjecting Decedent to great physical and emotional pain and deprivation of his constitutionally protected rights and liberties.

<u>**Second Cause of Action:**</u>
**Constitutional and Civil Rights Violations - 42 U.S.C. § 1983**
(Against Defendant City, Schmaderer, and Does #11-25)

178.    All allegations above are renewed here.

179.    Plaintiff alleges that high ranking City of Omaha officials, including high ranking police supervisors, such as Defendant Schmaderer, Does 11 through 25, and/or each of them, knew and/or reasonably should have known, that Defendant Lugod, was untrained in, or trained below the standard of care, in the use of force and deadly force in responding to subjects who appear, act, and/or who manifest symptoms of intoxication and/or symptoms of mental impairment, and in situations as actually existing at all times prior to and while Defendant Lugod shot and killed Mr. Elrod all in violation of Elrod's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

18

180.     Said rights are substantive guarantees under the Fourth and Fourteenth Amendments to the US Constitution.

### Third Cause of Action:
### Wrongful Death

181.     All allegations above are renewed here.

182.     Decedent's wrongful death deprived his next of kin of his care, comfort, companionship, society, support, services, advice, counsel, love, and affection. He was married and had six (6) children.  He is survived by his next of kin identified above.   The claimant presents this claim for wrongful death on behalf of the next of kin.

183.     General damages are sought independently and individually for each of the Decedent's next of kin for his wrongful death.

### Fourth Cause of Action:
### Conscious Pain & Suffering

184.     All allegations above are renewed here.

185.     There are three independent conscious pain and suffering claims each have distinct time periods.

186.     There are multiple independent conscious pain and suffering claims each having distinct time periods.

187.     The first period of Mr. Elrod's conscious pain and suffering is solely based upon events from the moment immediately after the first bullet struck Mr. Elrod and before the second bullet struck Mr. Elrod.

188.     The second period of Mr. Elrod's conscious pain and suffering is solely based upon events from the moment immediately after the second bullet struck Mr. Elrod and before the third bullet struck Mr. Elrod.

189.     The third period of Mr. Elrod's conscious pain and suffering is solely based upon events from the moment immediately after the third and final bullet struck Mr. Elrod up to and until his death, approximately three hours later.

190.     Mr. Elrod lived and consciously suffered for approximately three hours before his death.

191.     General damages are sought for the Decedent's conscious pain and suffering.

**Fifth Cause of Action:**
**Funeral & Burial**

192.     All allegations above are renewed here.

193.     Special damages are sought for payment for all expenses incurred for the medical care, transportation, care for, and disposal of Mr. Elrod's body, and for his funeral expenses. These special damages are estimated in the total sum of $5,000.

**Damages**

194.     All allegations above are renewed here.

195.     As a direct and proximate result of Defendants' actions and inactions, Plaintiffs incurred funeral and related costs.

196.     Plaintiff seeks judgement for general damages for Decedent's next of kin for his wrongful death in a sum in excess of any cap in any relevant statute.

197.     Plaintiff seeks general damages for Decedent's Estate for the conscious pain, fear, apprehension, and suffering he suffered prior to his death in a sum in excess of any cap in any relevant statute.

198.     Plaintiff seeks general damages for Decedent's violations of his constitutional and civil rights.

199.     Plaintiff seeks punitive damages for Defendant Lugod's reckless or callous or willful or deliberate indifference to decedent's constitutional and civil rights.

200.     Plaintiff seeks all other applicable damages of any kind for Decedent's violation of his constitutional and civil rights.

201.     In alternative to the foregoing, and only in the event the Plaintiff does not prove actual harm at trial, Plaintiff then, and only then, would seek nominal damages.

202.     Plaintiff seeks attorney's fees and expert witness fees and any and all costs as applicable by law.

203.     Leave to amend claims and damages at the time of the final pretrial conference is requested.

DB1308.02

**Requests for Relief**

204.   On the foregoing basis, Plaintiff requests this court assume jurisdiction over this case and hold a jury trial and enter judgment against each and all of the Defendants on each of the above Causes of Action and:

204.1.   Declare the Defendants' acts and failures to act described herein acts that violated Mr. Elrod's constitutional and civil rights; and

204.2.   Award all special and general damages sought herein; and

204.3.   Award punitive damages against Defendants; and

204.4.   Punitive damages under any other available mechanism; and

204.5.   All taxable court costs and litigation expenses to Mr. Elrod's Estate, and taxing them against the Defendants on all claims; and

204.6.   Attorney's fees and costs to the extent recoverable by law, including but not limited to, those available under 42 U.S.C. § 1988; and

204.7.   Prejudgment interest as allowed by law; and

204.8.   Any and all other relief deemed just and equitable.

**Jury Demand**

205.   Plaintiff respectfully demands trial by jury.


May 25, 2018.

Lucinda Beadle, Personal Representative
of the Estate of Daniel A. Elrod,
Plaintiff,


By: _____
   Brian E. Jorde, #23613
   DOMINALAW Group pc llo
   2425 South 144th Street
   Omaha, NE  68144-3267
   402-493-4100
   *Plaintiff's Lawyer*

DB1308.02