### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LUCINDA BEADLE, Personal Representative of the Estate of Daniel A. Elrod, Deceased, | ) ) ) ) | CASE NO: 8:18-cv-82 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **BRIEF IN SUPPORT OF ALVIN F. LUGOD'S MOTION FOR SUMMARY JUDGMENT BASED UPON QUALIFIED IMMUNITY** |
| THE CITY OF OMAHA, a political subdivision of the State of Nebraska; TODD SCHMADERER, in his official capacity as Chief of the City of Omaha Police Department; ALVIN LUGOD, individually and in his official capacity as an officer of the City of Omaha Police Department; DOES 1-25, inclusive, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Defendant Alvin F. Lugod, in his individual capacity, submits this Brief in support of his Motion for Summary Judgment Based Upon Qualified Immunity. In support thereof, the Defendant states to the Court the following:

### SUMMARY OF ARGUMENT

In the early evening hours of February 23, 2015, Officer Alvin Lugod responded to a report of a robbery. He encountered Daniel Elrod, the suspect in the robbery who repeatedly refused to follow lawfully given commands, resisted apprehension, declared that he had a gun, and moved towards other officers on the scene in a manner in which Officer Lugod believed presented a threat of deadly force to those officers. Officer Lugod then fired his service weapon, using an objectively reasonable amount of force under the totality of the circumstances. Officer Lugod is entitled to qualified immunity in his individual capacity against the Plaintiff's claims,

1

as (1) the force he employed was objectively reasonable and (2) because there was no clearly established right for Mr. Elrod to verbally threaten officers with the use of a firearm, while Mr. Elrod's right hand was obstructed from Officer Lugod's view and Mr. Elrod was turning towards other officers on scene.

## STATEMENT OF UNDISPUTED FACTS

1. On February 23, 2015, Officer Alvin F. Lugod was on routine patrol with his partner, Officer Bradley Bornhoft, near the intersection of 15th and Dorcas Streets in Omaha, Douglas County, Nebraska.

>Exhibit 1, Page 1, Paragraph 1.

2. That evening, between 6:22 to 6:30 p.m., Daniel Elrod entered the Family Dollar located at 1725 S 13th Street, Omaha, Nebraska. Mr. Elrod grabbed a packet of Slim Jims and approached the cash register at the Family Dollar. When the cash register opened Mr. Elrod forcefully reached into the cash register and stole approximately $52.15, and the packet of Slim Jims.

>Exhibit 2, Page 1.
>Exhibit 3, Page 1-2.
>Exhibit 4, Page 2.

3. After Mr. Elrod forcefully grabbed the money out of the cash register and left the Family Dollar a customer called 911 and handed the phone to the Family Dollar employee who was working the cash register.

>Exhibit 2, Page 1.

4. While finishing a prior call with Officer Bornhoft, Officer Lugod heard the tones come across the dispatch radio for a robbery at the Family Dollar located at 1725 S 13th Street. Upon hearing the tones and announcement that a robbery had occurred, Officer Lugod and his partner got into their marked Omaha Police Department cruiser and head to 1725 S 13th Street.

Officer Lugod believed that he was heading to the scene of an armed robbery.

>Exhibit 1, Page 1, Paragraph 2.
>Exhibit 5.

5. As Officer Lugod, driving his marked police cruiser, approached the Family Dollar at 1725 S 13th Street he observed three individuals standing outside of the store. Officer Lugod pulled his cruiser up next to them. These individuals then gave a description of the robbery suspect to Officer Lugod and his partner, pointed north up 13th Street, and stated that the individual who had just robbed the store was walking in that direction.

>Exhibit 1, Page 2, Paragraph 3.
>Exhibit 6, 6:32:07 – 6:32:16.

6. After briefly speaking with the witnesses from the Family Dollar Officer Lugod drove his police cruiser northbound on 13th Street searching for the suspect. Officers Lugod and Bornhoft encountered Mr. Elrod, an individual who matched the suspect's description, roughly one block to one and a half blocks north of the Family Dollar.

>Exhibit 1, Page 2, Paragraph 4.
>Exhibit 6, 6:32:25.

7. At approximately 6:32:25 p.m. Officers Lugod and Bornhoft encounter Mr. Elrod. Upon doing so Officer Lugod activated the emergency lights of his police cruiser and pulled his cruiser up next to Mr. Elrod. Both officers exited the police cruiser and command Mr. Elrod to show them his hands.

>Exhibit 1, Page 2, Paragraphs 5-6.
>Exhibit 6, 6:32:25 – 6:32:32.

8. Mr. Elrod initially complies with the officers' commands to show them his hands and drops the bag that he is carrying. Officer Lugod then commands Mr. Elrod to get down on

the ground four separate times, and Officer Bornhoft repeats that command once. Mr. Elrod refuses to comply with those commands and begins to walk away from the officers.

> Exhibit 1, Page 2, Paragraph 6.
> Exhibit 6, 6:32:32 - 6:32:40.

9. Mr. Elrod then says "shoot me" twice, lowers his hands, turns his back on Officers Lugod and Bornhoft, and continues to disobey commands and evade arrest by moving to the other side of two parked vehicles, placing those vehicles between Mr. Elrod and the officers.

> Exhibit 1, Page 2, Paragraph 7.
> Exhibit 6, 6:32:44 – 6:32:51.

10. After Mr. Elrod moves behind two parked vehicles Officer Lugod continues to order him to get down on the ground. Mr. Elrod repeatedly refuses to follow Officer Lugod's commands, sometimes keeping his hands in the air and at other times lowering his hands to his waistband.

> Exhibit 1, Page 2, Paragraphs 6-8.
> Exhibit 6, 6:32:51 – 6:33:02.

11. As Officer Lugod continues to order Mr. Elrod to get on the ground additional Omaha police officers begin to arrive on scene. These officers repeatedly command Mr. Elrod to keep his hands in the air. Mr. Elrod briefly raises his hands, and then lowers his hands to his waistband.

> Exhibit 6, 6:33:05 – 6:33:14.
> Exhibit 7, 6:33:02 – 6:33:14.

12. During this time Officer Lugod can repeatedly be heard imploring Mr. Elrod to follow commands, exclaiming "Don't make me do this man" and "Do not make me do this man; you're going to get shot."

> Exhibit 6, 6:33:13 – 6:33:22

13. At approximately 6:33:34 Mr. Elrod climbs onto the hood of the vehicle parked in front of him. Mr. Elrod then places his left hand on the fence that is behind him to assist his balance, and lowers his right hand to his waistband, where it remains for several seconds.

> Exhibit 7, 6:33:34 – 6:33:55.

14. At 6:33:39 – 6:33:40 p.m. Mr. Elrod declares "I've got a gun motherfucker." When Mr. Elrod makes this declaration his right hand is lowered to his waistband in the location where a handgun could be concealed.

> Exhibit 1, Page 2, Paragraph 7-8.
> Exhibit 6, 6:33:39 – 6:33:40.
> Exhibit 7, 6:33:39 – 6:33:40.

15. At approximately 6:33:57 Officer Geyza deployed a Taser electronic control device in an attempt to subdue Mr. Elrod. The device was ineffective and Mr. Elrod was able to remove the prongs and attached wires from his person.

> Exhibit 1, Page 3, Paragraphs 10.
> Exhibit 6, 6:33:57 – 6:33:58.
> Exhibit 7, 6:33:57 – 6:34:02.

16. After Mr. Elrod removed the Taser prongs and wires from his person he turned angrily toward Officer Bornhoft and the other officers who had arrived on scene, with his right hand remaining at his waistband. Officer Lugod's view of Mr. Elrod's waistband and right hand became obstructed as Mr. Elrod turned toward these other officers.

> Exhibit 1, Page 3, Paragraph 11.
> Exhibit 7, 6:34:02 – 6:34:06.

17. Mr. Elrod then began to move off of the hood of the vehicle that he was standing on. In doing so he removed his right hand from his waistband and began to raise it in the direction of the other officers on scene.

5

>Exhibit 1, Page 3, Paragraph 11.
>Exhibit 7, 6:34:04-6:34:06.

18. Officer Lugod, fearing for the safety of the other officers on scene, fired his service weapon three times and struck Mr. Elrod.

>Exhibit 1, Pages 3-4, Paragraphs 11-12.
>Exhibit 6
>Exhibit 7, 6:34:06 – 6:34:07.

19. Mr. Elrod subsequently died of the injuries he sustained.

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts and the inferences in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex* at 323.

In response to the proponent's showing, the opponent's burden is to "come forward with

6

'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 106 S.Ct. 1348 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.*

> "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law . . . Instead, 'the dispute must be outcome determinative under prevailing law."

*Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). *Accord Dico, Inc. v. Amoco Oil Co.,* 340 F.3d 525, 529 (8th Cir. 2003). Moreover, "[t]he party opposing summary judgment cannot rest solely on the pleadings, but instead must set forth specific facts showing there is a genuine issue of material fact for the trial . . . Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Morris v. City of Chilicothe,* 512 F.3d 1013, 1018 (8th Cir. 2008), quoting *Morgan v. A.G. Edwards,* 486 F.3d at 1039. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Moore v. Indehar*, 514 F.3d 756, 764 (8th Cir. 2008), (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, (1986)).

Further, when determining whether a dispute is genuine, a court should weigh objective evidence, such as video, against the allegations of the parties. *Scott v. Harris*, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Additionally, a civil rights plaintiff must "(1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact

7

as to whether the official would have known that his alleged conduct would have violated [the] plaintiff's clearly established right" in order to survive a motion for summary judgment based on qualified immunity. *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996), referencing *Foulks v. Cole County, Mo.*, 991 F.2d 454, 456 (8th Cir. 1993). To determine whether a government defendant is entitled to qualified immunity, the reviewing court must decide whether the alleged facts demonstrate that the government official violated a constitutional right and whether the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "The court has discretion to decide which element of the qualified immunity defense to address first." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011), referencing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

**ARGUMENT**

**OFFICER LUGOD'S USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES AND THERE IS NO CLEARLY ESTABLISHED RIGHT FOR AN INDIVIDUAL TO VERBALLY THREATEN ANOTHER WITH THE USE OF A FIREARM WHEN THAT INDIVIDUAL'S HANDS ARE OBSTRUCTED FROM VIEW AND THE INDIVIDUAL IS MOVING TOWARD OTHERS ON SCENE.**

Apprehension by use of deadly force… is a seizure subject to the reasonableness requirement of the Fourth and Fourteenth Amendments. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Of course, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. *Id*. at 9. Hence, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*. at 11. "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may

8

be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. at 11-12; *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the United States Supreme Court held that the question of whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable office on the scene, rather than with the 20/20 vision of hindsight." *Id*. In making this determination, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-397.

In the present case, Officer Lugod, in his individual capacity, has asserted the defense of qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. ___, ___, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017)(alterations and internally quotations omitted). "Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. ___, ___, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White* at 552. And the

Supreme Court has "repeatedly told courts… not to define clearly established law at a high level of generality." *City and County of San Francisco v. Sheehan*, 575 U.S. ____, 135 S.Ct. 1765, 1775-1776, 191 L.Ed.2d 856 (2015); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

"'Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Kisela* at 1152, quoting *Mullenix v. Luna*, 577 U.S. ___, ___, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela* at 1153, quoting *Mullenix* at 309.

To determine whether a government defendant is entitled to qualified immunity, the reviewing court must decide whether the alleged facts demonstrate that the government official violated a constitutional right and whether the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "The court has discretion to decide which element of the qualified immunity defense to address first." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011), referencing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

**I.  The force used by Officer Lugod against Mr. Elrod was objectively reasonable under the totality of the circumstances.**

The Plaintiff's claim of excessive force must be evaluated under the reasonableness standard of the Fourth and Fourteenth Amendments. *McKenney v. Harrison,* 635 F.3d 354, 359 (8th Cir. 2009). The test for establishing a constitutional violation under the Fourth and

10

Fourteenth Amendments' right to be free from excessive force is "whether the amount of force used was objectively reasonable under the particular circumstances." *Brown v. City of Golden Valley,* 574 F.3d 491, 496 (8th Cir. 2009). The court must "determine whether a use of force was reasonable by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *McKenney,* 635 F.3d at 359 (internal quotation marks and citations omitted). In addition, in determining whether the use of force was reasonable, the court must consider "the totality of the circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting or attempting to flee." *Cook v. City of Bella Villa,* 582 F.3d 840, 849 (8th Cir. 2009).

On February 23, 2015 Daniel Elrod robbed the Family Dollar located at 1725 S 13th Street, Omaha, Douglas County Nebraska. Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6. In committing this criminal offense Mr. Elrod used physical force against an employee of the Family Dollar, who "resisted [Mr. Elrod] at first but eventually let [Mr. Elrod] take the money out." Exhibit 2, Page 1. Mr. Elrod then left the Family Dollar and headed northbound up 13th Street. Exhibit 1; Exhibit 2; Exhibit 5. Officers Lugod and Bornhoft soon arrived at the Family Dollar. They encountered three witnesses to the robbery outside, who provide Officers Lugod and Bornhoft with Mr. Elrod's description and pointed them northbound down 13th Street.

It is at this point that the allegations alleged in the Plaintiff's Amended Complaint (Doc. # 13) diverge from Officer Lugod's Statement of Undisputed Facts. However, Officer Lugod's Statement of Undisputed Facts are supported and verified by two police cruiser dash-cam videos that captured different viewpoints of the incident that occurred on February 23, 2015. As a result

11

this Court, when determining whether a factual dispute is genuine, should weigh objective evidence, such as video, against the allegations of the parties. *Scott v. Harris*, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). And, it is these videos that independently show the danger that Mr. Elrod posed to the officers on scene, and Mr. Elrod's repeated attempts to resist arrest and attempt to evade capture.

As Officers Lugod and Bornhoft approached Mr. Elrod in their police cruiser Officer Elrod activated the emergency lights on the vehicle. Exhibit 1, Page 2, Paragraph 5-6; Exhibit 6, 6:32:25 – 6:32:32. Both officers then exited the vehicle and instructed Mr. Elrod multiple times to show them his hands and to get on the ground. Exhibit 1, Page 2, Paragraphs 5-6; Exhibit 6, 6:32:25 – 6:32:40. Although Mr. Elrod initially complies with the command to show the officers his hands, he refuses to get on the ground, begins to walk away from the officers, and lowers his hands. Exhibit 1, Page 2, Paragraphs 6-7; Exhibit 6, 6:32:32 – 6:32:51. In doing so Mr. Elrod begins to actively resist arrest and begins his efforts to evade capture.

Mr. Elrod can then be heard telling Officer Lugod to "shoot me" on the video recording. Exhibit 6, 6:32:44 – 6:32:51. He continues his movements away from Officers Lugod and Bornhoft, walking behind two parked vehicles and putting those vehicles between himself and Officers Lugod and Bornhoft. Exhibit 1, Page 2, Paragraph 7; Exhibit 6, 6:32:44 – 6:32:51. Officer Lugod then pursues and corners Mr. Elrod outside of the left frame of Exhibit 6, while Officer Bornhoft takes up a position to the left of Mr. Elrod in the center of the frame of Exhibit 6. During this time Officer Lugod continues to issue commands to Mr. Elrod, telling him to get on the ground as additional Omaha police officers begin to arrive on scene. Officer Lugod also

implores Mr. Elrod to follow his commands, exclaiming "Don't make me do this man" and "Do not make me do this man; you're going to get shot." Exhibit 6, 6:33:13 – 6:33:22.  In doing so Officer Lugod warned Mr. Elrod that continued escalation of the situation could result in the use of deadly force.  See *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir.2012)("Before employing deadly force, an officer should give some warning when it is feasible to do so… [the officer] acted reasonably. [The officer] drew his firearm, pointed it at [the suspect], and repeatedly ordered him to get on the ground. [The officer's] conduct should have put [the suspect] on notice that his escalation of the situation would result in the use of the firearm.")(Internal quotations and citations omitted).

Mr. Elrod continued to disobey commands however and climbed onto the hood of a parked vehicle. Exhibit 7, 6:33:34 – 6:33:55.  He lowered his right hand to his waistband and declared "I've got a gun motherfucker." Exhibit 1, Page 2, Paragraph 7-8; Exhibit 6, 6:33:39 – 6:33:40; Exhibit 7, 6:33:39 – 6:33:40.  With that statement Mr. Elrod threatened Officer Lugod and the other officers on scene with a firearm, an element which once satisfied may allow a law enforcement officer to use deadly force.  Nevertheless Officer Lugod, who could still see Mr. Elrod's right hand at that point, refrained from using deadly force.

Instead Officer Lugod called for another officer on scene to use a Taser, or an electronic control device, to subdue Mr. Elrod. Exhibit 1, Page 3, Paragraph 10.  Officer Geyza then deployed her Taser in an attempt to subdue Mr. Elrod, but the Taser was ineffective and Mr. Elrod was able to remove the prongs and the attached wires from his person. Exhibit 1, Page 3, Paragraph 10; Exhibit 6, 6:33:57 – 6:33:58; Exhibit 7, 6:33:57 – 6:34:02.  After removing the Taser prongs from his person "Mr. Elrod's agitation was escalated" and he turned away from Office Lugod and toward the other officers on scene, keeping his right hand lowered to his

13

waistband. Exhibit 1, Page 3, Paragraph 11; Exhibit 7, 6:34:02 – 6:34:06. Seconds after the failed use of the Taser Mr. Elrod began to move away from Officer Lugod and off of the hood of the vehicle that he was standing on. Exhibit 1, Page, 3, Paragraph 11; Exhibit 7, 6:34:04 – 6:34:06.

It is at this point that the court must consider "the totality of the circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting or attempting to flee." *Cook* at 849. Mr. Elrod had used physical force to commit the criminal offense of robbery. When he encountered uniformed police officers with their service weapons drawn Mr. Elrod refused to follow their lawfully given commands, and resisted arrest by moving away from the officers and by placing obstacles between himself and Officers Lugod and Bornhoft. As other officers arrived on scene Mr. Elrod continued to ignore their commands to keep his hands visible and to get on the ground. Instead, Mr. Elrod lowered his hands, frequently keeping his right hand near the waistband of his pants where a handgun could be concealed. Mr. Elrod then climbed onto the hood of a vehicle, making it more difficult for officers to reach him. Once upon the hood of the vehicle Mr. Elrod declared "I've got a gun motherfucker" while keeping his right hand down at the waistband of his pants, directly threatening the officers on scene. The officers then attempted to use a less-than-lethal means of subduing Mr. Elrod by deploying an electronic control device. Mr. Elrod again actively resisted arrests by removing the prongs and attached wires from his person.

The video marked as Exhibit 7 then clearly showed Mr. Elrod, with his right hand down by his waist and his left hand up on the fence, begin to turn away from Officer Lugod and towards the other officers on scene. As Mr. Elrod turns he obstructs Officer Lugod's view of his

right hand, and we can clearly see that right hand begin to move up and forward in Exhibit 7. Exhibit 7, 6:34:02 – 6:34:06.

20/20 hindsight tells us that Mr. Elrod was reaching for the fence with his right hand. But Officer Lugod, with an obstructed viewpoint of Mr. Elrod, had to make a split second decision. Officer Lugod was confronting an agitated suspect who had stated that he had a gun. The suspect was moving away from Officer Lugod and turning toward other officers on scene, one of which had just unsuccessfully attempted to use a Taser upon Mr. Elrod. As Mr. Elrod did so he began to raise his right hand from his waistband. Officer Lugod feared for the safety of other officers on scene, and fired his service weapon.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable office on the scene, rather than with the 20/20 vision of hindsight." *Graham* at 396. "An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself [or others] against a fleeing suspect who turns and moves as though to draw a gun." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir.2001)(brackets added), referencing *Ryder v. City of Topeka*, 814 F.2d 1412, 1419 n. 16 (10th Cir.1987)("concluding that, because a requirement that a suspect actually have a weapon would place police in a 'dangerous and unreasonable situation… whether a particular seizure is reasonable is dependent on the 'totality of the circumstances,' and not simply on whether the suspect was actually armed."). And the Eighth Circuit has held that "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir.2012).

## II. There is no clearly established right for an individual to verbally threaten another with the use of a firearm when that individual's hands are obstructed from view and the individual is moving toward others on scene.

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela* at 1153, quoting *Mullenix* at 309. "'Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Kisela* at 1152, quoting *Mullenix* at 308.

The majority of qualified immunity cases at the Supreme Court and in the Eighth Circuit seem to involve armed suspects or high speed vehicle pursuits. Neither of those situations are present under the facts of this case. There are a few cases though that involve excessive force or qualified immunity and unarmed suspects. One such case is *Billingsley v. City of Omaha*, 277 F.3d 990 (8th Cir.2002). In *Billingsley* the Eighth Circuit upheld a jury verdict in favor of an off-duty police officer who shot a burglary suspect after the suspect jumped off of a balcony to avoid apprehension, landed in a crouched position, and then rotated his left shoulder. Although the suspect was eventually discovered to be unarmed, the off-duty officer still believed that the suspect posed a risk of death or serious bodily injury when the suspect moved to rotate his shoulder, as the suspect could have been turning toward the officer to fire a weapon. In discussing the reasonableness of the officer's use of force, the Eighth Circuit cited *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir.2001), where the Court previously held "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly

16

force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Billingsley* at 994.

The Court also compared the facts in *Billingsley* to *Ryder v. City of Topeka*, 814 F.2d 1412 (10th Cir.1987) and *Reese v. Anderson*, 926 F.2d 494 (5th Cir.1991). In *Ryder*, an officer shot a suspected burglar who he was pursuing down a darkened alley. The suspect, a fourteen-year-old girl, was running with her hands in her pockets. The Tenth Circuit held that as a result of the officer's inability to see the suspect's hands, "a jury could infer that [the officer] had probable cause to believe that the suspect he was chasing down the darkened alley was both armed and prone to violence." *Ryder* at 1421. Similarly in *Reese*, the Fifth Circuit overturned a District Court's denial of an officer's motion for summary judgment, finding that the officer could reasonably believe that an individual who's hands were obstructed while sitting in a vehicle and reaching down repeatedly could be reaching for a firearm and was about to shoot. *Reese* at 500-501.

The facts of this case present a unique situation. Officer Lugod was confronted with a suspect who had committed a robbery by use of force. The suspect repeatedly refused to follow lawfully given commands, and affirmatively stated that he was armed with a gun. Despite repeated commands to keep his hands in the air, Mr. Elrod kept his right hand down by his waistband where a handgun could be concealed. Most importantly, Officer Lugod only used deadly force when Mr. Elrod turned away from him, obstructing Officer Lugod's view of Mr. Elrod's right hand, and began, from Officer Lugod's vantage point, to move toward other officers on scene. Officer Lugod believed that Mr. Elrod presented an imminent threat of deadly force to other officers in the immediate area, and fired his service weapon.

17

## CONCLUSION

In the early evening hours of February 23, 2015, Officer Alvin Lugod responded to a report of a robbery. He encountered Daniel Elrod, the suspect in the robbery who repeatedly refused to follow lawfully given commands, resisted apprehension, declared that he had a gun, and moved towards other officers on the scene in a manner in which Officer Lugod believed presented a threat of deadly force to those officers. Officer Lugod then fired his service weapon, using an objectively reasonable amount of force under the totality of the circumstances. Officer Lugod is entitled to qualified immunity in his individual capacity against the Plaintiff's claims, as (1) the force he employed was objectively reasonable and (2) because there was no clearly established right for Mr. Elrod to verbally threaten officers with the use of a firearm, while Mr. Elrod's right hand was obstructed from Officer Lugod's view and Mr. Elrod was turning towards other officers on scene.

Respectfully submitted this 27th day of August, 2018.

ALVIN F. LUGOD, Defendant.

By: s/ Ryan J. Wiesen
RYAN J. WIESEN, No. 24810
Assistant City Attorney
1819 Farnam Street, Suite 804
Omaha, NE 68183
(402) 444-5115
Ryan.Wiesen@cityofomaha.org
Attorney for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2018, I electronically filed the foregoing **BRIEF IN SUPPORT OF ALVIN F. LUGOD'S MOTION FOR SUMMARY JUDGMENT BASED UPON QUALIFIED IMMUNITY** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record or their attorneys in the above captioned case registered with the system.

                                                          s/ Ryan J. Wiesen
                                                           Assistant City Attorney