**United States District Court**
**District of Nebraska**

| | |
|---|---|
| Lucinda Beadle, Personal Representative of the Estate of Daniel A. Elrod, Deceased, | Case No. 8:18-cv-82 |
| **Plaintiff,** | |
| v. | |
| Former Officer Alvin Lugod, individually and in his official position as an Omaha Police Officer and Agent of the City of Omaha, Does 1-25, inclusive, in their official capacities, Todd Schmaderer only in his official capacity as City of Omaha Chief of Police, And The City of Omaha, | **Plaintiff's Brief in Opposition to Defendant Alvin Lugod's Motion for Summary Judgment Based on Qualified Immunity** |
| **Defendants.** | |

Plaintiff, in her opposition to Defendant Alvin Lugod's Motion for Summary Judgement, in his individual capacity only, based on an alleged qualified immunity defense states:

1.      Plaintiff Lucinda Beadle, Personal Representative of the Estate of Daniel A. Elrod, deceased, ("Plaintiff") brought this action under 42 U.S.C. § 1983 to recover damages caused by the violation of the deceased's rights under the Fourth and Fourteen Amendments to the United States Constitution in connection with his killing by former Omaha police officer, Defendant Alvin F. Lugod ("Lugod"). Section 1983 creates a private right of action to remedy violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 1501, 182 L.Ed.2d 593 (2012). The cause of action is available against "[e]very person who acts under color of state law to deprive another of a constitutional right." *Id.* (citation and internal quotation marks omitted).

2.      The question to be addressed by the court is whether Lugod violated Mr. Elrod's clearly established constitutional rights when he shot Mr. Elrod in the back three

times as Mr. Elrod with Mr. Elrod's hands raised in the air and exposes as he was attempting to climb a fence into a confined parking lot. For the reasons set forth below, Plaintiff respectfully requests Defendant Lugod's motion be denied in its entirety.

## PLAINITFF'S RESPONSE TO DEFENDANT LUGOD'S UNDISPUTED FACTS

3.     Existing evidence directly rebuts and contradicts some of the alleged "undisputed facts" set forth in Defendant's Brief. Plaintiff also takes exception with Defendant's deliberate and misleading exclusion of other key undisputed facts. Notably, substantially all evidence aside from Defendant's Exhibit 1—including Omaha Police Department "OPD" internal investigative reports finding Lugod acted unreasonably under the circumstances when Lugod shot Mr. Elrod. Internal OPD reports reveal Lugod shot Mr. Elrod in the back as Mr. Elrod was clearly attempting to climb a fence, that Mr. Elrod was in the complete vision of other officers when Lugod shot him, and that he would have been trapped in a small, confined parking lot had he been successful in his attempt to climb the fence.  To the extent evidence is in dispute, such as whether Mr. Elrod's hands were visible to Lugod as he climbed the fence, the Court must resolve the dispute in favor of Plaintiff for purposes of this summary judgment.

4.     Without limiting these reservations, Plaintiff responds to Defendant's stated undisputed facts as follows:

5.     **Paragraph 1**: Plaintiff does not dispute.

6.     **Paragraph 2**: Plaintiff does not dispute that the suspect in question engaged in a "snatch and grab" theft of money. Plaintiff disputes any legal conclusion that this constituted a "robbery" within the meaning of *Neb Rev Stat* § 28-324. Nicholas Skiles reported the suspect presented to the counter with money to pay for a four (4) pack of Slim Jims but after Mr. Skiles opened his register to give the suspect change, the suspect reached forward into the register to grab the money. (Skiles Statement #22-2). The suspect then walked out of the Dollar store with some of the money from the register.  (*Id*.).

DE0562.04

7.     **Paragraph 3**: Plaintiff does not dispute that the suspect in question engaged in a "snatch and grab" theft of money. Plaintiff disputes any legal conclusion that this constituted a "robbery" within the meaning of *Neb Rev Stat* § 28-324. With regard to the Family Dollar 911 call to Douglas County, the 911 operator asks the caller whether the suspect, "show[ed] a weapon?" (Def. Ex. 5 #22-5 at 1:19). The 911 caller from Family Dollar responded, "No, he just reached right into my register and started grabbing." (Def. Ex. 5 #22-5 at 1:21). The suspect identified in the Family Dollar robbery 911 call did not run from the scene and was "walking down the street" northbound on 13th Street away from the scene. The 911 dispatch later asks again, "No weapons shown?" (Def. Ex. 5 #22-5 at 2:57). The caller, identified as [first name] Nicholas, replies, "There was no weapon shown to me." (Def. Ex. 5 #22-5 at 2:59).

8.     **Paragraph 4**: Plaintiff does not dispute that Lugod heard a dispatch radio call for a "robbery" at the Family Dollar located at 1725 S. 13th Street and drove to the location. There is no evidence in any record that Lugod or other officers were advised of a weapon, an "armed" robbery, or other any basis for believing a weapon was involved. In Defense Exhibit 1, Lugod states, "I heard tones come across the dispatch radio for a robbery at the Family Dollar located at 1725 South 13th Street in Omaha, Nebraska." (Def. Ex. #22-1 at ¶ 2). However, he further states, "after hearing the tones, I believed that an **armed** robbery had just occurred at that location…" *Id.* (Emphasis added).  This belief is not supported by any evidence produced by Defendant. In the additional dispatch audio, dispatch can be heard providing a description of suspect and saying, "Grabbed money," but does not state a weapon was present. (Audio–Shots Fired #25-2 at 11 sec). The record is completely devoid of any mention that the suspect mentioned, brandished, or used a weapon or otherwise possessed a weapon during his presence within the  store or upon leaving the store to walk north bound on the east side of 13th Street.

9.     **Paragraph 5**: Plaintiff does not dispute.

10.    **Paragraph 6**: Plaintiff does not dispute.

11.    **Paragraph 7**: Plaintiff does not dispute.

DE0562.04

12.   **Paragraph 8 – 12**: Plaintiff disputes Lugod's contentions in these paragraphs. When police cruiser 365 driven by Lugod with his partner, Officer Bradley Bornhoft, arrived at the Sports Car Garage parking lot where they first encountered Mr. Elrod, Mr. Elrod was walking slowly on the sidewalk carrying a plastic sack in his right hand and wearing a large cumbersome winter glove on his left hand.  (Def. Ex. 6 #22-5 at 18:32:29; Lugod Depo Ex #25-4, e. 29).  Lugod ordered Mr. Elrod to get on the ground, Mr. Elrod dropped the white plastic sack which he was carrying in his right hand and raised both arms into the air with hands clearly visible. (Def. Ex. 6 #22-6 at 18:32:32-33; Lugod Depo Ex #25-4, e. 30). Upon encountering Mr. Elrod, whose hands were in the air and facing the officers, Lugod believed Mr. Elrod was under the influence of drugs or alcohol because, according to Lugod, Mr. Elrod's eyes were dilated. (Lugod Depo #25-3 at 114:15–115:5;  Lugod Depo Ex. #25-4, e. 43 at p.46; and Lugod Depo Ex #25-4, e. 19 at pp.21, 38). Despite this, Lugod escalated the situation by threatening to shoot Mr. Elrod almost immediately as his hands were still in the air and he started backing away slowly. Three to four seconds after making contact with Mr. Elrod, Lugod can be heard screaming, "You're gonna get shot." (Def. Ex. 6 #22-6 at 18:32:40; Audio–Shots Fired #25-2 at 18-22 sec.).

13.   Mr. Elrod continued to hold both hands visibly in the air until he moves off of the dash cam video. (Def. Ex. 6 #22-6 at 18:32:39; Lugod Depo Ex. #25-4, e. 31). Lugod inexplicably began screaming at Mr. Elrod, "You're gonna get shot," at an individual he believed to be under the influence of drugs, alcohol, or experiencing hallucinations.   Mr. Elrod responds, "Shoot me. Shoot me." (Def. Ex. 6 #22-6 at 18:32:44). Later, he is heard saying while his hands remain in the air, "For what? For what?" (Def. Ex. 6 #22-6 at 18:32:54). Mr. Elrod walked backwards towards the barbed wire fence near the building of the Sports Car Garage and in front of a black SUV against a fence, cornering himself in between a concrete cinderblock wall and the barbed wire fence of enclosed parking lot. (Def. Ex. 6 #22-6 at 18:32:48; Def. Ex. 7 #22-7 at 18:33:00). He continued to hold both both hands in the air. (Def. Ex. 6 #22-6 at 18:32:52; P. Pope Interview #25-9 at p. 5; J. Edwards Interview #25-6 at p.6). There is no evidence

4

in the record that Mr. Elrod took any aggressive action or moved toward the officers at any time. Lugod believed Mr. Elrod was under the influence of drugs or alcohol or was experiencing hallucinations (Lugod Depo Ex. #25-4, e. 43 at p.17) (stating, ". . . he was seeing something, you know, that's not there.").

14.     Lugod told Mr. Elrod to get on the ground and Mr. Elrod responds, "For what? For what?" while his hands are still in the air.  Lugod continued to threaten Mr. Elrod, saying, "You are gonna get shot."  (Def. Ex. 6 #22-6 at 18:33:04).  Mr. Elrod remained cornered in between a barbed wire fence and the concrete cinderblock wall of the Sports Car Garage. (Def. Ex. 7 #22-7 at 18:33:00). At this time, Mr. Elrod was surrounded by four (4) or more police officers all with weapons drawn and yelling orders at him. (Def. Ex. 7 #22-7 at 18:33:07).  Lugod can be heard saying "Don't make me do this, man!" (Def. Ex. 6 #22-6 at 18:33:13).  No other police officer is heard making this type of threat. There appears to be significant dispute as to what was actually said by Mr. Elrod. Lugod claimed Mr. Elrod said he had a gun. Defense Exhibit 6 does not establish this allegation. Not every officer on the scene heard the alleged statement. (B. Martin Interview #22-10 at p.4) (stating, "No. I don't even think I heard the, uh; suspect even say anything."). Lugod later provides differing testimony on his exchange with Mr. Elrod during this time. Twice, Lugod claims to have claimed Mr. Elrod said, in effect, that he had a gun and "I'm gonna pull it out and point it at you." (Lugod Depo Ex #25-4, e. 19 at pp. 28).  Lugod claimed to have responded, "No you don't," and "No one's gonna get shot. Just get on the ground and let's work this out," when Mr. Elrod supposedly threatened him with a gun. (Lugod Depo #25-4, e. 19 at pp.22, 28; Lugod Depo #25-4, e. 43 at pp.8-9, 15). These statements appear to have been fabricated and they are unsupported by any other evidence in the record and in fact completely contradicted by the audio on Defense Exhibit 6.

15.     **Paragraph 13 through 16**: Plaintiff disputes Lugod's contentions in these paragraphs. Mr. Elrod stepped on top of the hood of one of the vehicles presenting a better view of himself to all officers. (Def. Ex. 7 #22-7 at 18:33:33). Other officers appear to lower their weapons on multiple occasions, even turning away from Mr. Elrod.

5

(See Def. Ex. 6 #22-6 at 18:33:18; 18:33:20; 18:33:50; 18:33:53).   Lugod is overheard requesting a taser, which undermines his claim that Mr. Elrod was threatening to shoot him. (Def. Ex. 6 #22-6 at 18:33:49).   Prior to this Mr. Elrod is heard saying, "Shoot me? Shoot me?" just before being hit by a taser. (Def. Ex. 6 #22-6 at 18:33:54).

16.     A moment after Mr. Elrod is hit with the taser, he uses both hands to remove the taser prongs. Both hands go to his waist area – the area now Lugod claims was an area of concern that Lugod purportedly believes a gun may have been located – but no officer fires his or her weapon.

17.     **Paragraph 17**: Plaintiff disputes Lugod's contentions in this paragraph. Seconds later, Mr. Elrod attempted to climb the barbed wire fence with his leg half way in the air and hands gripping the fence slightly above his shoulders. (Def. Ex. 6 #22-6 at 18:34:05; Def. Ex. 7 #22-7 at 18:34:05; Lugod Depo #25-4, e. 12, e. 13, e. 14; B. Bornhoft Interview #25-7 at   p.17; A. Anderson Interview #25-8 at   p.6; P. Pope Interview #25-9 at p. 8; B. Martin Interview #25-10 at p. 5;).   His back was to Lugod. (Def. Ex. 7 #22-7 at 18: 34:05; Autopsy Report #25-5). All evidence besides statements by Lugod after the shooting—including OPD's internal investigation report—agree that Mr. Elrod's hands were visible when Lugod shot him. Lugod stated Mr. Elrod's hands were at "shoulder level" when he turned to the fence. (Def. Ex. 7 #22-7 at 18:34:04; Lugod Depo #25-4, e. 43 at p.36; Lugod Depo #25-4, e. 14).   No other officer used deadly force at any time.

18.     **Paragraph 18**: Plaintiff disputes Lugod's contentions in this paragraph. Plaintiff agrees Lugod shot Mr. Elrod in the back three (3) times as he was climbing the fence attempting to flee the officers. (Autopsy Report #25-5 at p.1). Lugod stated he was concerned for the safety of his partner, Officer Bornhoft, but does not appear to have had a reasonable fear for his own safety or the community, as no members of the community were in the immediate vicinity. (Lugod Depo #25-3,133:13-18 & 134:13-19; Lugod Depo #25-4, e. 43 p.37).   Plaintiff alleges Mr. Elrod's hands were both plainly visible and in the air to climb the fence with his back to Lugod. Plaintiff asserts Mr. Elrod was not making any motion toward any officer. (Def. Ex. 7 #22-7 at 18:34:00 to 18:34:06). For

6

the reasons stated below, Plaintiff disputes that Lugod did, in fact, fear for the safety of himself, the other officers on scene, or members of the community. Alternatively, Plaintiff disputes that such belief was reasonable. To the extent evidence in Defense Exhibit 1 supports Lugod's allegation to the contrary, the conflict must be resolved in favor of Plaintiff for purposes of summary judgment.

19.   **Paragraph 19**: Plaintiff does not dispute. The autopsy report confirms that each of Lugod's three (3) shots struck Mr. Elrod's back. (Autopsy Report #25-5 at p.1). Lugod was interviewed twice in internal investigations of the shooting. (Lugod Depo #25-4, e. 19, e. 43).  Following this investigation, Lugod chose to resign when informed he would otherwise be terminated. (Lugod Depo #25-4, e. 44).

## SUMMARY JUDGMENT STANDARD

20.   Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). In reviewing a motion for summary judgment, the Court is to view "the record in the light most favorable to the nonmoving party ... drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (*citing Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment*. Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014). If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment. *White v. McKinley*, 519 F.3d 806, 815 (8th Cir. 2008).

21.   The court must carefully review the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so 'blatantly contradicted by the record ... that no reasonable jury could believe [them].' " *O'Neil v. City of Iowa City, Iowa,* 496 F.3d 915, 917 (8th Cir.2007) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007) (alterations in

7

original).  The burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Lujan v. Defenders of Wildlife*, 477 U.S. 317, 331, 106 S.Ct. 2548, 2557 (1986).

## ARGUMENT

22.    An officer is entitled to qualified immunity "unless (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Wenzel v. City of Bourbon*, 2018 WL 3767362 (8th Cir. 2018) (filed August 9, 2018);  *Solomon v. Petray*, 795 F.3d 777, 786 (8th Cir. 2015) (*quoting Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012)). In making this determination, a court must also afford the nonmoving party all reasonable inferences to be drawn from the record. *Id.* If the evidence, viewed in the non-movants favor, establishes a constitutional violation, and the right was clearly established, qualified immunity must be denied. *Capps*, 780 F.3d at 884. The two-steps can be addressed in either order. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

23.    The doctrine of qualified immunity requires the court to analyze each defendant's actions individually because a person may be held personally liable for a constitutional violation under § 1983 only if his own conduct violated a clearly established constitutional right. *Parrish v. Ball,* 594 F.3d 993, 1001 (8th Cir.2010). "Clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

24.    The question presented is straightforward: Was shooting Mr. Elrod three times in the back objectively reasonable when his back was turned and hands in the air as he was attempting to climb a fence into a confined car lot (*i.e.* where there was no chance of escaping that confinement) and was his right not to be shot under such circumstances "clearly established"?

8

**Disputed Material Facts Preclude Summary Judgment**

25.     In Defense Exhibit 1, Lugod stated "I believe that Mr. Elrod was a danger and a threat to myself, and other officers on the scene and to the community at large." This directly contradicts and is inconsistent with testimony offered in his deposition (Lugod Depo #25-3 at 133:13-18; 134:13-19) and his internal investigation interviews (Lugod Depo #25-4, e. 19, pp. 53-54,) in which he stated his sole fear was for the safety of his partner, Officer Bornhoft. Like Lugod, Bornhoft had a perfect view of Mr. Elrod, who was standing atop a car, illuminated by a flood light and three OPD patrol car's headlights, while attempting to climb a fence with his back turned. Eighth Circuit law holds that Lugod's inconsistent statements regarding his state of mind, upon which Lugod's use of deadly force was predicated, is now a dispute of material fact and must be submitted to a jury. Mr. Elrod was trapped, standing on top of a car surrounded by and in complete view of at least five (5) officers with nothing in his hands, and no members of the public in the vicinity. In his interviews, Lugod claimed to have responded, "No you don't," when Mr. Elrod supposedly said he had a gun and threatened to "point it" at Lugod.  (Lugod Depo #25-4, e. 19, pp.22, 28, 49-50; Lugod Depo #25-4, e. 43, pp. 8-9). This and other statements Lugod claimed in his interviews to have occurred during the interaction with Mr. Elrod now appear to have been entirely fabricated. See Defense Exhibit 1.Whether Lugod did, in fact, perceive a threat must be resolved in favor of Plaintiff for purposes of summary judgment.

26.     There is no evidence to support the contention Mr. Elrod was reaching for anything at the time Lugod shot him. Mr. Elrod's back was turned. Given Lugod's deposition and previous interviews, it is undisputed that Mr. Elrod was attempting to climb a fence when Lugod shot him. Plaintiff asserts that Mr. Elrod's hands were each visible to Lugod and all other officers at the time Lugod shot him. Although Lugod now claims he could not tell if Mr. Elrod was attempting to jump off the car, in light of other officers' statements and the photos of the incident, a reasonable jury could conclude that any such alleged belief was unreasonable. This dispute of material fact must be resolved in favor of Plaintiff for purposes of summary judgment.

DE0562.04

27.     Insofar as there is any inconsistency between Lugod's deposition testimony and his later affidavit (Defense Exhibit 1), Eighth Circuit precedent dictates that this constitutes a genuine issue of material fact. *See Perry v. Woodruff County Sheriff Dep't by and through Baker*, 858 F.3d 1141 (8th Cir. 2017) (denying qualified immunity to sheriff's deputy) (*citing Herring v. Can. Life Assurance Co*., 207 F.3d 1026, 1031 (8th Cir. 2000); *Kim v. Ingersoll Rand Co.*, 921 F.2d 197, 199 (8th Cir. 1990). Here, there is significant inconsistency between Defense Exhibit 1 and Lugod's previous deposition testimony and his OPD internal interviews.

28.     The nature of Lugod's verbal exchange with Mr. Elrod prior to the shooting is also in dispute. In his interviews, Lugod describes a very different interaction with Mr. Elrod. Lugod stated that he said to Mr. Elrod, "No one is gonna get shot." This does not appear in Defense Exhibit 1. Moreover, at one point, in response to Mr. Elrod's supposed threats that he had a gun, Lugod claimed to have replied, "No you don't." In his interviews of February 28, 2018, and March 12, 2018, Lugod stated:

>  **"The second time he said that, that's when I said no you don't**. And then, um, then he made that motion again to where he was reaching for the same area, that left appendix area, after lifting his, uh, parka. Uh, and that's when he said, oh yeah, well I'm gonna pull it out and point it at you. And that's when I told him don't make me do this man.

(Lugod Depo #25-4, e. 19 at 28) (Emphasis added).

". . . And I told him, '**No one's gonna get shot.'**"

(Lugod Depo #25-4, e.43 at p.8) (Emphasis added).

". . . But, the, the one thing I remember him saying was that, 'You're gonna have to shoot me,' and then I said, '**No, you're not gonna get," you know, no one's gonna get shot**. . .'"

(*Id*. at p.15) (Emphasis added).

"Right. And so I told him, **I said no one's gonna get shot. Just get on the ground and let's work this out**."

(Lugod Depo #25-4, e. 19 at pp. 22) (Emphasis added)

10

29.    We know now from the audio/video evidence available and cited above that this exchange is a complete fabrication. Lugod specifically says several times "You're gonna get shot!" as heard in Defense Exhibit 6. These statements, however, create yet another issue of material fact as to whether Lugod even *actually*, let alone reasonably, perceived a credible threat – not to mention the many changing recollections of Mr. Lugod.

30.    Further, as stated above, Lugod believed Mr. Elrod was under the influence of drugs or alcohol. (Lugod Depo #25-3 at 114:15–115:5). In his interview of March 12, 2018 with Sergeant Scherer ("TS"), Lugod ("AL") indicated he believed Mr. Elrod may have possibly been hallucinating or mentally ill.

**TS**: So, what you're describing as irrational is just him not complying? Um, he's not . . . is he talking about what he's seeing things, or is he making nonsensical type of statements?

**AL**: He . . . he wasn't saying anything, but he was seeing something, you know, that's not there. . .

(Lugod Depo #25-4, e. 43 at p.17).

. . . .

**TS**: Okay. Um. You keep mentioning that the suspect's eyes were dilated?

**AL**: Yes.

**TS**: Wha, when did you determine that?

**AL**: The very first time that I, um, that he made (clears throat) – excuse me – the very first time that he made eye contact with me, when I was, uh, trying to get him to comply with me to get down on the ground. Um, like I said earlier, he, he fixated on me to where he was looking at me. His eyes were dilated. And based on my past experiences, um, it led me to believe that he was under the influence of either narcotics or, uh, alcohol.

(Lugod Depo #25-4, e.43 at p.46).

31.    It is incredible that Lugod could be so perceptive as to see the suspect's eyes with sufficient detail to determine that that were supposedly "dilated" at nighttime

DE0562.04

yet could not similarly perceive other important and potentially life-saving details of the surrounding circumstances. Similarly, it brings into question whether Lugod acted reasonably by immediately threatening with death a person clearly under the influence of drugs, alcohol, or mental illness causing hallucinations. This issue is for the jury to decide.

32.     A significant dispute of material fact remains whether Mr. Elrod's hands were visible as he was attempting to climb the fence while his back was turned. It is an undisputed fact that Mr. Elrod never had a weapon or any other object in his hands from the time he initially dropped his bag and put his hands in the air when first encountered by Lugod and ordered to do so until the moment he was killed. Lugod states in regards to Mr. Elrod that "he turned from me, obscuring my vision of Mr. Elrod's hands…" (Def. Ex. 1 #22-1 at ¶ 11). Defense Exhibit 7 and Exhibit 25-4, e. 11, 12, 13, and 14 and cruiser video (Def. Ex 7 #22-7) cast serious doubt on this claim. These images show Mr. Elrod turned from Lugod with his hands in the air and on the fence above shoulder height in his attempt to climb into the confined fenced off parking area.

33.      Similarly, other officers agree Mr. Elrod was clearly climbing the fence when he was shot in the back. No other officer perceived the need for deadly force or to fire their weapon at that moment. In fact no other officer used force of any kind. The Court must resolve this dispute of material fact in favor of Plaintiff and find that both of Mr. Elrod's hands were *visible* as he attempted to climb the fence.

34.     The internal investigation of Officer Jon Edwards, *who wrote the lesson plan for Use of Force Policy*, when asked to analyze the cruiser videos of the shooting strongly suggests that Lugod acted unreasonably in shooting Mr. Elrod. This appears to have been based on *the same evidence Lugod has now submitted to the Court* in support of his motion for summary judgment. Sergeant Scherer's ("TS") exchange with Officer Edwards ("JE") states, in relevant part:

> **TS**: Um, Officer Lugod s, [sic] I'm sorry, I'm gonna go back actually. Officer Bornhoft says that after the suspect, um, pulls the taser wires from himself, um, that he makes **one complete motion towards the fence with**

12

**his hands in the air and, um, does not proceed to make any motions towards him, um, in any way that he's coming at him or that he's pulling a weapon on him and that his hands go straight up to the fence.** Officer Lugod, um, informed me that the, um, suspect turns his back, um, faces the fence and has his hands in the air as he does so. Is that an appropriate time to, uh, um... fire your weapon at the suspect, to use lethal, lethal force? (Emphasis added).

**JE**: **Uh, no.** If you're, you're observations are the fact that the party has empty hands . . . uh, and is facing a... **The mere fact that he turned away from you is not just cause to, or just not reasonable 'ta, 'ta [sic] apply deadly force. If, you know, and again, if you see empty hands . . . based on the information and the video seen, that didn't appear to be a, a reasonable time 'ta [sic] fire your service weapon.**

. . . .

**TS**: Okay. So, um, if Officer Lugod's statement is that the suspect's hands are up in the air when he turns toward the fence, um, and that is when he fires his weapon your conclusion is?

**JE**: **It doesn't appear to be a reasonable decision at the time** 'ta, 'ta [sic] fire ... to, to apply deadly force to that suspect at that time.

(J. Edwards Interview #25-6 at p.7-8) (Emphasis added).

35.     In his interview with Sergeant Tracy Scherer ("TS") following the shooting, Officer Bradley Bornhoft ("BB"), Lugod's partner on the night of the shooting, also agreed that Mr. Elrod was shot in the back as he attempted to scale a fence. Officer Bornhoft stated,

**TS**: So, so you don't remember any specific?

**BB**: And if uh . . .

**TS**: . . . about, of an armed, a, a, a weapon at all?

**BB**: I don't remember any specifics.

(B. Bornhoft Interview #25-7, p.5)

13

. . . .

**TS**: Okay. So, um, once he pulls the tasers off, um ... what does he do then, how, how does that?

**BB: I think it was shortly after that where he turned around and hoppin' the fence.**

**TS**: Okay.

**BB**: I mean, he turned ... the way, he turned, it was, it was towards me and, like, towards me and Pope, but he **completed [sic] turned around and hopped on the fence**.

**TS**: **He didn't hesitate, like, tryin' to decide . . .**

**BB**: Not. . . .

**TS**: . . . **what to do, come after you or hop over that fence?**

**BB**: **Not that I can remember.**

**TS**: Okay. Do you remember, in your mind, if he's gonna go over that fence, had Lugod not shot him, what would have been your next plan, what would you have done? Did you think that far?

**BB**: Uh ... I guess we were just waitin' and see what his next move would be.

**TS:** Okay.

**BB**: But, I mean ... 'cause w, we, you know, **we had him cornered**; he wasn't gonna ... I guess my . . . just depends on what he was gonna do.

        (B. Bornhoft Interview #25-7 at  p.17) (Emphasis added).

. . .

**TS**: Do you think he would have been trapped inside there I guess is what I'm asking?

**BB: If he would have made it over, if the barbed wire, like, goes all the way around . . .**

**TS**: **Mm hmm.**

**BB**: . . . **he would have been trapped in there I think.**

        (B. Bornhoft Interview #25-7 at  p.18) (Emphasis added).

14

36.     In an internal investigation interview, Officer Aaren Andersen ("AA") casts further doubt on Lugod's assertion that Mr. Elrod charged or moved toward officers. Officer Andersen stated,

> **TS**: What is the suspect doing when you're arriving?
>
> **AA**: Um, it, like he was having some type 'a communication with Lugod. Whether I, like I said, I can't remember what it was. Then as I turned the corner I seen him turn. And, like whether he was turning, for whatever reason, to jump the fence I don't know. **I seen [sic] him turn, like, reach up towards the fence or reach for somethin' [sic], and that when I'd obviously seen the shooting.**
>
> (A. Anderson Interview #25-8 at p.6) (Emphasis added).
>
> . . . .
>
> **TS**: Did you hear anything from the point that you guys are heading there to the point that shots are fired? Did you ever hear anybody mention a weapon at all?
>
> **AA**: **I never heard anything about a weapon.**
>
> **TS**: Okay.
>
> **AA**:  Um, the only thing I heard on the radio was Lugod's mic got keyed and he said somethin' [sic] to the effect, "Do it now or you're gonna [sic] get shot," or somethin'[sic]  like that.
>
> (A. Anderson Interview #25-8 at  p.7) (Emphasis added).

37.     Similar factual questions arise in the testimony of Officer Patricia Pope ("PP"). In her internal investigation interview following Mr. Elrod's death. Officer Pope stated, in relevant part,

> **TS**: Okay. Um, was there enough time to react if he had a weapon?
>
> **PP**: From ... the first incident when he did that . . . um, I believe there was enough time there. **He pulled his hands out. It was obvious he didn't have a weapon because he put his hands like this afterwards. He didn't have a**

15

**weapon in his hand.**

**TS**: Put his hands up? Okay.

    (P. Pope Interview #25-9 at p. 5) (Emphasis added).

               . . . .

**TS**: Um, does he ever make any motions towards you guys that you think that he's gonna [sic] come at you? Or does he pretty much stay on top of the car?

**PP**: He's pretty much on top of the, the car. And, like I said, he would turn a little bit towards the fence.

**TS**: **Like he was trying to get away, or?**

**PP**: **Sometimes. But there was that, there was wire on it, so, uh, I don't know what he was thinkin'.**

**TS**: What if he had gotten over that fence? What would you have done then?

**PP**: **He would have been trapped in there**; I mean, it was like a fenced, fenced in area, then he would have 'ta [sic] climb the other fence.

**PP**: I mean we would have 'ta. Other cars were already arriving at that time. I don't know. We would all have 'ta [sic] just . . . we, I don't know what we would have done at that moment.

**TS**: Okay. But, so what you're saying is that he's, he's kind 'a looking for a way out but he's got no place to go? Is that?

**PP**: Correct.

    (P. Pope Interview #25-9 at p. 7) (Emphasis added)

    38.   Sergeant Scherer's interview with Officer Brent Martin ("BM") further suggests that Mr. Elrod was climbing the fence when Lugod shot him. Officer Martin stated, "And then, uh, uh [sic] suspect turns and appeared to reach for the fence, and that's when shots were fired." (B. Martin Interview #25-10 at p.2). Officer Martin also noted the following:

**TS**: Um, you said you can hear Officer Lugod giving the suspect commands, like, "Show me your hands?" Did you hear any other conversation back and forth?

DE0562.04

**<u>BM</u>: No. I don't even think I heard the, uh; suspect even say anything.**

**<u>TS</u>: The suspect never said anything?**

**<u>BM</u>: Not that I can remember.**

(B. Martin Interview #25-10 at p.4) (Emphasis added).

. . . .

<u>TS</u>: Okay. But nobody on the-scene says he has a gun?

<u>BM</u>: No, I think this. By the time we got out of the car and when the incident happened was probably 15, 20 seconds, maybe even less than it. It was pretty, pretty quick.

<u>TS</u>: Okay. Um. So . . . what do you see as the shots are fired? Do you remember?

<u>BM</u>: Um. I remember him, like, the suspect was on the hood of the car. Commands and then he turns, I think it would be towards his left, so he would have turned towards I think those female officers, their, uh, location then. Um. I don't know if that's when the shots are exactly fired. **And then I seen it, you know, his hand; I don't know both if both hands or one hand went on the top of the fence.**

**<u>TS</u>: Okay.**

**<u>BM</u>: It was a pretty high fence and there's kind 'a barbed wire on the top.**

(B. Martin Interview #25-10 at p. 5)(Emphasis added).

. . . .

<u>TS</u>: Okay. Um. Did you ever hear anybody afterwards say that he had a weapon or anything like that?

<u>BM</u>: Hmm mm. [No.]

(B. Martin Interview #25-10 at p.7).

39.     During his interview immediately after the shooting, Lugod stated that during the standoff with Mr. Elrod, in response to Mr. Elrod's alleged statement that he had a gun, Defendant Lugod replied, ". . . that's when I said no you don't." (Lugod Depo #25-4, e. 19 at p.28). The interviewer was also confused by this statement, noting:

17

DIEGUEZ: Okay. Earlier you told me that at one point he tells you, you know, the first time he says, uh, you're gonna [sic] have to shoot me. I have a gun. Or, the second time, I'm sorry. **And you told him no you don't.**

LUGOD: Mh hm. [Yes.]

DIEGUEZ: Okay. Now you're telling me that, that you think he's got a gun.

> (Lugod Depo #25-4, e. 19 at p.49).

. . . .

DIEGUEZ: Did, when he's on the hood of the car, is he making . . . I know you said he was moving his hands when he's standing on the hood of the car . . .

LUGOD: Mh hm.

DIEGUEZ: . . . but is, is there anything . . .

LUGOD: (clears throat)

DIEGUEZ: Is he making any gestures like he's gonna [sic] reach for his waistband?

LUGOD: Uh, not that I could remember. Um, like I said, uh, I saw that his hands were moving but I, I don't remember is he was if he was reaching for his gun again for the fourth time. I just remember those first three.

> (Lugod Depo #25-4, e. 19 at p.50-51).

. . . .

DIEGUEZ: When he's on the hood and he turns his back to you.

LUGOD: Mh hm.

DIEGUEZ: **Where are his hands?**

LUGOD: Uh, it was **still on the first rung of the, uh, barbed wire**.

> (Lugod Depo #25-4, e. 19 at p.55)   (Emphasis added).

40.     Defendant Lugod also makes clear that he believed Mr. Elrod was under the influence of drugs or alcohol at the time he was shot, or perhaps, mentally ill or experiencing hallucinations.

**TS**: So, what you're describing as irrational is just him not complying? Um, he's not . . . is he talking about that he's seeing things, or is he making

18

nonsensical type of statements?

**AL**: He . . . he wasn't saying anything, but he was seeing something, you know, that's not there. . . .

(Lugod Depo #25-4, e. 43 at p.17).

41.     When confronted with the fact that it sounded like Mr. Elrod was trying to climb the fence (also noting, almost inconceivably, that he has never had a suspect try to get away after making contact), Lugod also admits that Mr. Elrod was not walking toward him.

**TS**: Okay. Do you think he was trying to get away?

**AL**: Uh. I'm, I'm sure that's ... I'm sure he was thinking that. But, like I said,

I . . . . he, he never gave any indication to me that he was trying to get away;

um, especially, you know, after the initial contact with him.

**TS**: Other than the fact that he's not complying with you.

**AL**: Right.

**TS**: And he's not walking towards you.

**AL**: Right.

(Lugod Depo #25-4, e. 43 at 19).

42.     In his deposition, Lugod further agrees that Mr. Elrod was not moving toward officers with his hand hidden at the time Lugod shot him. (See Ex 14 of depo). When confronted with a photograph of the moment he shot Mr. Elrod as captured by the dashcam of the squad cars, Lugod acknowledged:

> **Q.** All right. And let's focus just on
> Exhibit 14. Would you agree that in this photo,
> I mean, you see the location of the fence, his
> arm appears to be on it and he's leaping away
> from where you're standing towards the fence,
> would you agree with that?
>
> **A. That's what it appears to be, yes.**
> **Q.** All right. In this photo he does not

19

make any leaping or lunging towards the officers

in the right-hand side of the photo, does he?

**A. From this photo it looks -- it**

**doesn't look like that, no.**

(Lugod Depo #25-3 at 133:19–134:5) (Emphasis added).

### Undisputed Facts are Sufficient for a Reasonable Jury to Find that Lugod's Decision to Shoot Mr. Elrod Was Unreasonable Under the Circumstances.

43.     Resolving all factual disputes in favor of Plaintiff, a reasonable jury could find that Lugod's actions were unreasonable. However, even *undisputed* facts are sufficient for it to do so.

44.     Whether the use of deadly force is reasonable turns on "the totality of the circumstances, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect is actively fleeing or resisting arrest." *Wallace v. City of Alexander, Arkansas*, 843 F.3d 763, 768 (8th Cir. 2016) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). All disputes on these issues—and Plaintiff argues that there are several disputed issues of material fact—must be resolved in favor of Plaintiff. See *Mems v. City of St. Paul,* 224 F.3d 735, 739 (8th Cir.2000) ("Credibility determines, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

45.     "[A] reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene." *Neal v. Ficcadenti*, 895 F.2d 576 (8th Cir. 2018)(*citing Ngo v. Storlie*, 495 F.3d 597, 603 (8thCir. 2007)). "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch*, 689 F.3d at 965 (*citing Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see Brosseau v. Haugen*, 543 U.S.

194, 197 (2004) ("[I]t is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" (quoting *Garner*, 471 U.S. at 11)).

46.    As stated above and confirmed by the statements of officers and the videos attached to Lugod's motion, it is undisputed that Mr. Elrod was on top of a car with his arms extended in attempt to climb a fence into a confined parking lot when he was shot. His back was turned from Lugod and he was not "moving toward" officers. The autopsy report confirms each of Lugod's three (3) shots entered into Mr. Elrod's back.

47.    Lugod absurdly frames this issue as whether there is a "clearly established right for an individual to verbally threaten another with the use of a firearm when those individual's hands are obstructed from view and the individual is moving toward others on scene." See Defendant's Brief Section 1 of Argument. Framing the issue in the manner is a blatant attempt to inhibit clarity of the known facts. Lugod's framing also profoundly misstates *undisputed* facts (*i.e.* that Mr. Elrod was shot in his back and was attempting to climb a fence when Lugod fired the shots, precluding his "moving toward" officers). Further, Lugod obscures genuine disputes of material facts (*i.e.* what type of "verbal threat" was made against officers, if any, and whether Mr. Elrod's hands were visible as he climbed the fence), resolving them decisively and improperly in favor of himself, the moving party. The Court must not follow suit.

48.    Certain facts are not in dispute in this case. Although Lugod does not cite some of them, they weigh heavily in favor of presenting this case to a jury. Those facts include the following:

48.1    The individual who robbed the store in question did not have a weapon. No store employee or bystander was harmed, threatened, or assaulted. No weapon was displayed nor verbal threat of violence made. No report of a weapon was conveyed to the 911 dispatch. No radio call communicated the threat of an armed suspect or a weapon to responding officers, including Lugod.

48.2    Mr. Elrod was, in fact, unarmed when Lugod shot and killed him.

48.3    Each of the three shots Lugod fired struck Mr. Elrod *in the back*.

48.4   All the witnesses to the incident and the dashcam videos agree that Mr. Elrod *was attempting to climb into a fenced in area with no reasonable means of escape* when Lugod shot him.

48.5   Had Mr. Elrod been able to scale the fence, it was obvious he would have been confined in the fenced-in car lot, and thus, could not have escaped. All officers present on the scene testified that this was apparent.

48.6   No other officer besides Lugod fired at Mr. Elrod.

48.7   A month after the shooting, as the result of the internal investigation into his actions on February 23, 2015, Lugod was effectively terminated by Defendant OPD for his actions.

49.   In *Wallace v. City of Alexander, Arkansas*, 843 F.3d 763, 768 (8th Cir. 2016), the Eighth Circuit rejected a defendant police officer's motion for summary judgment based on qualified immunity. The police officer was named as a defendant in an action under § 1983 brought by the estate of an unarmed man whom the officer shot and killed. The Eighth Circuit found that qualified immunity did not apply when the suspect was attempting to flee. After discarding a firearm, the suspect refused commands to get on the ground, resisted the officer, and began to flee. In rejecting the officer's claim of qualified immunity, the Eighth Circuit articulated the reasoning that should apply equally to the present case, stating,

> Since the Supreme Court decided *Tennesse v. Garner* in 1985, it has been clearly established "that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officer or others is not permitted." *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008). Further, such a threat must be "immediate." *Garner*, 471 U.S. at 11, 105 S.Ct. 1694. We have thus concluded that an officer violated *Garner* by using deadly force to seize an individual who did not possess a weapon and was attempting to flee the scene of a potentially violent crime. *See, e.g.*, *Moore*, 514 F.3d at 763. Here, viewing the evidence in the light most favorable to the estate, Wallace did not pose an immediate and

22

significant threat of serious injury to Cummings or bystanders because he may not have committed any violent felony, the physical struggle was minimal, and he was not "holding a firearm" when he attempted to flee. *See id.* Viewing the facts in the light most favorable to the estate, a reasonable fact finder could thus conclude that the seizure violated a clearly established constitutional right.

*Wallace*, 843 F.3d at 769–70.

50.     The Eighth Circuit's reasoning in *Wallace* demonstrates any reasonable officer should have known that shooting a fleeing suspect in the back as his hands were displayed and he was attempting to climb a fence was excessive and unreasonable force. Indeed, the internal investigation Lugod's actions concluded as much given it immediately precipitated his termination. Like the decedent in *Wallace*, the autopsy report shows that Mr. Elrod was shot in the back with each of the three (3) shots. Attached exhibits conclusively demonstrate Mr. Elrod repeatedly showed his hands and was climbing a fence into a confined area when Lugod shot him.

51.     In *Capps v. Olsen*, 780 F.3d 879 (8th Cir. 2015), the Eighth Circuit found a sheriff's deputy was not entitled to qualified immunity when he shot a suspect five times, including *once* in the back, killing him. Factual evidence was in dispute as to (1) whether the suspect was moving towards the deputy when he was shot, and (2) whether a reasonable officer could have believed the suspect was armed. The deputy and a witness claimed the suspect had something in his hands and was charging at the officer. The Eighth Circuit, noting its duty to resolve factual questions in favor of the nonmoving party, stated,

> This Court must presume Capps was not facing Deputy Olson and Deputy Olson did not believe Capps possessed a weapon at the time of the shooting. If the jury were to determine that Capps refused to listen to Deputy Olson's commands and moved toward Deputy Olson with what appeared to be a weapon, the use of deadly force could have been objectively reasonable. However, taking the evidence in the light most favorable to Capps we must conclude there is a factual

23

dispute as to whether Deputy Olson violated Capps's Fourth Amendment right against excessive force.

*Capps*, 780 F.3d at 885.

52.   Here, the undisputed facts are even stronger for denying qualified immunity. Unlike *Capps*, all of Lugod's shots entered Mr. Elrod's back. All officers on the scene other than Lugod agree Mr. Elrod was climbing a fence into a confined area. No other officers fired their weapons. Mr. Elrod never had anything in his hands after dropping his bags upon being ordered to show his hands. The OPD's internal investigation concluded the incident justified terminating Lugod. Like *Capps*, the Court must resolve any factual disputes in favor of Lugod.

53.   The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied.  *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009). Here, no other officers on the scene at the time Lugod shot Mr. Elrod fired their weapons. The OPD's investigation concluded that Lugod's use of force was not reasonable. Under these circumstances, there is little more for the Court to determine for purposes of summary judgment based on qualified immunity.

### Mr. Elrod had a Clearly-Established Right Under the Circumstances to Not be Shot and Killed

54.   Plaintiff turns now to the question of whether or not Mr. Elrod's constitutional right that Lugod violated was "clearly established" as of February 23, 2015. The Eighth Circuit had said many times that "[t]he right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." *Shannon v. Koehler*, 616 F.3d 855, 864 (8th Cir. 2010) (*quoting Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)). The "salient question" is whether the state of the law on February 23, 2015, gave Lugod "fair warning" that shooting Mr. Elrod under the circumstances was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

DE0562.04

55.     The United States Supreme Court recently reiterated, "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (quoting *Ashcroft*, 563 U.S. at 742). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he is doing violates that right." *Wallace v. City of Alexander, Arkansas*, 843 F.3d 763, 769 (8th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

56.     "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Mann v. Yarnell,* 497 F.3d 822, 825 (8th Cir.2007) (*quoting Guite v. Wright,* 147 F .3d 747, 750 (8th Cir.1998)); see also *Small v. McCrystal,* 708 F.3d 997, 1005 (8th Cir. 2013) (citing *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006); and *Smith v. Kansas City, Missouri Police Department*, 586 F.3d 576 (8th Cir 2009) (denying police officer's claim of qualified immunity based on genuine issue of fact as to whether officer used excessive force with a struggling arrestee). Notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (citing *id.* at 9.). "Where the suspect poses no *immediate threat to the officer and no threat to others*, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11. (Emphasis added). "There is extensive case law setting forth the requirement that an officer must have 'probable cause to believe that the suspect poses a threat of serious physical harm' before using deadly force." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009) (citing *Craighead v. Lee,* 399 F.3d at 962 (collecting cases that put officers on notice that they may not use deadly force under circumstances in which "they should know that the suspect does not present an

immediate threat of serious physical injury or harm,")). The Court must again resolve disputed facts in favor of Plaintiff.

57.     Stated simply, among many other court rulings, the Supreme Court's ruling in *Tennesee v. Garner* examining shootings of fleeing suspects shows that Mr. Elrod's right not to be shot was "clearly established" when it occurred while he climbing a fence with his back to officers, his hands visible, and without an immediate threat to Lugod, other officers, or the public. Lugod did not fear for his own life or members of the general public, who were not present. Mr. Elrod was already cornered by armed officers. The fence he attempted to climb would have trapped him further, as it was very clearly a small, confined parking lot entirely surrounded by a barbed wire fence. Had he been successful, he would have been left without any possible escape.

## CONCLUSION

58.     For the reasons stated above and the extensive material facts in dispute, Plaintiff asks this Court to deny Defendant Lugod's Motion for Summary Judgment Based Upon Qualified Immunity in its entirety.

September 6, 2018

> Plaintiff Lucinda Beadle, Personal Representative of the Estate of Daniel A. Elrod, deceased, Plaintiff
>
> By:   */s/ Brian E. Jorde*
>       Brian E. Jorde, #23613
>       Domina Group pc llo
>       2425 South 144th Street
>       Omaha, NE  68144-3267
>       (402) 493-4100
>
>       bjorde@dominalaw.com
>       Plaintiff's Lawyer

DE0562.04

**Certificate of Service**

I hereby certify that on September 6, 2018, I electronically filed the foregoing Brief in Opposition to Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record in the above captioned case registered with the system.

/s/ Brian E. Jorde
Brian E. Jorde

DE0562.04